No. 37.—Henry B. Latimer, Guardian, &c., plaintiff in error, *vs.* James F. Alexander, defendant.

[1.] A master cannot absolve himself from the legal and equitable obligation to take care of his slave; and if he refuse to do so, he is liable for medical and other relief, furnished by others.

[2.] If a slave be hired to an insolvent, or be out of the possession of the hirer, and be placed in a situation to require instant and indispensable medical aid or other assistance; in such a case, the owner as well as the hirer, would probably be liable for necessary medical and other services.

[3.] The hirer of the slave, and not the general owner, is liable in an action for medicine and medical services rendered the slave, while the term of

hiring continued—the services and medicine not being rendered at the request of the owner, but at the request of the hirer.

[4.] A particular custom in a county, that the general owner shall pay the expenses, does not supercede or control the legal principle.

[5.] The hirer of a negro is not entitled to an abatement from the price, on account of the sickness of the negro, unless the sickness originated in causes existing at the time of the hiring, and which were unknown to the hirer.

[6.] The hirer of a slave is bound to use ordinary diligence, in regard to the health of the slave; that is, such diligence as a prudent man commonly takes of his own slave; and this ordinary diligence is to be employed, not only in protecting the slave from danger and disease, but likewise in discovering disease, if it exists, and in its treatment also.

[7.] If the hirer of a slave fail to perform his duty, in supplying the slave with medical and other necessary assistance, the owner may do it, and look to the hirer for re-imbursement.

[8.] Under special circumstances, the hirer, although primarily liable to the physician, might, nevertheless, be entitled to relief, as between the owner and himself, especially in a Court of Equity.

[9.] If a slave, hired for general and common service, be employed at any hazardous business, without the consent of the owner, and death, or any other damage ensue, the hirer would make himself liable for the injury.

[10.] Notwithstanding the hirer be answerable, in the absence of any agreement to the contrary, for expenses attendant on the sickness of a slave, it is competent to protect himself by contract.

Assumpsit, in DeKalb Superior Court.    Decided by Judge HILL, April Term, 1853.

The facts of this case were as follows:

The plaintiff in error had hired a negro man to Joseph Thompson, in the City of Atlanta, for a year.    During that period, and while the negro was in the possession of Thompson, he was attacked with small pox.    Thompson immediately called in Dr. Alexander, the defendant in error, as a physician, to attend the negro, without previously notifying his owner that he was sick.

Dr. Alexander attended on the negro; and on the refusal of the owner to pay his bill for so doing, brought this action to recover the amount.

No contract was shown between the owner and the hirer, as

to who was to pay for medical services, in case of sickness; but the testimony of several physicians was offered and admitted, to the effect, that it was their practice to charge the owner in such cases. A physician was permitted to testify his opinion, that the small pox is a dangerous disease; though he stated that he had never seen a case of it. To the above stated testimony, defendant objected; and excepts to its admission by the Court. It appeared in testimony, also, that the owner of the slave resided in the county, six or eight miles from Atlanta; that a great deal of alarm existed on account of the small pox, while it prevailed in Atlanta; and that intercourse between the town and country was very much obstructed by that alarm, though no legal obstacle was interposed.

This testimony was offered as a reason why the owner had not been notified of the negro's sickness.

The testimony being closed, the Court charged the Jury, that if the slave was in such a condition that there was not time to notify the owner, without probable injury to the slave, that the hirer could call in a physician; and the physician could collect his bill, out of either the owner or hirer, without notice to the owner.

The jury found for plaintiff; and the defendant excepted to the said rulings and charges of the Court.

MURPHY & COLLIER, for plaintiff in error.

CALHOUN, for defendant.

*By the Court.*—LUMPKIN, J., delivering the opinion.

[1.] It is conceded that circumstances might exist, which would fix a responsibility upon the owner, not only without his consent, but even against his dissent. We believe the case of *Fairchild vs. Bell*, (2 *Brevard*, 129) to be of this description. There, the owner of a female slave, had cruelly beaten her, and had driven her away from his house and plantation, and exposed her to perish for want of food and from the pains

of her bruises; and a neighboring physician, from motives of humanity, took the slave under his protection, and afforded her medical and other relief.   It was adjudged, and we think very properly, that the action of assumpsit might be maintained, to recover from the owner a recompense for medicine and attendance, and for the sustenance of the wench during her illness, notwithstanding the defendant had forbidden him to receive the slave, or give her any assistance.

The Court considered, as every enlightened tribunal would do, that the master was bound by the most solemn obligation, to protect and preserve the life of his slave; that he could no more divest himself of this obligation, than could the husband and father the duty of supporting and maintaining a wife or child; that the slave lives for his master's service alone—his time, his labor, his comforts, are all at his disposal; and that consequently, the duty of humane treatment and medical assistance, when clearly necessary, ought not and cannot be withholden by the owner; and that if he cruelly and capriciously attempts to do so, the aid and comfort denied by him, may be rendered by another, at his expense; that in such a case, the master, being under a legal and equitable obligation, a contract and liability will be implied, from the reason, justice and necessity of the case.

But this is a case where no other person is substituted for, and made to stand for the time being, in the *quasi* relation of master to the slave.

[2.] But I will go further.   In my opinion, the bare fact that the negro had been hired to another, does not necessarily and under all circumstances, absolve the owner from the duty which he owes, both to the slave and the community, to afford him protection, and provide for his wants in sickness and in old age.   Suppose the hirer is insolvent, or permit the slave to absent himself from him, and his life is in imminent danger, from disease, exposure or any other cause?   In a case so circumstanced, I should not hesitate to hold the master bound, to make compensation to the physician, victualler, clothier, or

any other good Samaritan, who would interpose, through humanity, to administer to the wants of the suffering slave.

[3.] But the cases supposed, are not the one before us. It is not pretended but that the hirer, Dr. Thompson, is abundantly able to pay. The negro was in his possession. Nor was the emergency so sudden and pressing as to take the case out of the rule, which will not allow one man to make another his debtor against his will; and which holds, that if one sees my fence out of repair, and he planks it up, to protect my property from depredation, that he can neither charge me with the expense, nor afterwards even take away the plank, which he has nailed to my posts.

The only question in this case, then, is whether Dr. Alexander is to look to Dr. Thompson, who employed him, for his bill, or is at liberty to charge Mr. Latimer, who did not employ him, nor have any knowledge of the sickness of the slave, or of the plaintiff's attendance, although he resided within six or eight miles of Atlanta at the time.

The Supreme Court of North Carolina, in *Haywood vs. Long*, (5 *Iredell*, 438) have answered this identical inquiry. They say, "We think very clearly the former, (Dr. Thompson.) If, indeed, the slave had not been hired out, the owner would not be liable for the physician's bill, unless there was a request of the owner, or subsequent promise to pay. At least, that must be the general rule ; though it may be liable to an exception, that where it is a case of life and death, or there is a pressing necessity for immediate assistance, the master would be liable for the attendance that was indispensable before there was a reasonable time and opportunity for notice to the master. But unless in a case of that kind—*if even in that*—the services of the physician, without the request of the owner, and at the instance of the slave or any one else, must be deemed gratuitous in respect to the master."

The Court notice the decision of Lord Kenyon, at *Nisi Prius*, in *Scarman vs. Castell*, (1 *Esp. Rep.* 270) where it was held, that the master was liable for medicine for his servant,

while in his service, upon the same ground that he was bound to provide food and lodging for him; and then proceed:

" But surely if liable at all, he ought not to be, until notice of the necessity, and his refusal or neglect to provide proper attendance and medicines." But the very reasons given in that case, says Judge Ruffin, "Show that *this plaintiff* cannot recover; for the liability is confined to the case in which the servant is under the master's roof, as a part of his family, and put upon the same footing as that for necessary food; thus placing the legal liability in *this case*, upon the person who was *in possession* of the slave—who was also the employer of the plaintiff."

"In this Court, there has been no case of this kind before; for we believe it has never been suggested hitherto, that the reversioner. if he may so be called, merely as such, was liable for medical services for the slave, more than for his food, while hired out, where they had been rendered, not at his request, but at that of the possessor."

The case of *Jones vs. Allen*, (*Ib.* 473) was the same as that of *Haywood vs. Long*, except that the plaintiff offered to prove, as he attempted to do in the case under consideration, that in the section of the county where the hiring took place, it was the custom for the owner and not the hirer, to pay for medical attendance on a slave. The Court again held, that there was no doubt of the liability of the temporary owner of hired slaves, for the expense of their maintenance and medicine during sickness; and that the general law upon that point, must operate, and could not be controlled by any understanding to the contrary in particular neighborhoods: that there was no established general custom on the point; for if there was, that would, in truth, be the law. But that a mere local usage, in a small part of the country cannot change the law, and give the plaintiffs an action against one man, when they were employed by another.

This question has been made and determined in the Courts of South Carolina. In the case of *Wells vs. Kennedy*, (4 McCord's Rep. 182) the Court of Appeals of that State held,

that the general owner was not liable for the doctor's bill, either by the rules of law, or the policy of the country; for that the hirer had no more right to throw the expenses of the negro's sickness upon the general owner, than to an abatement of the hire during the period of sickness.

As early as 1823, it was decided in our sister State of Alabama, that the *hirer* of a slave is bound to pay the physician for his services ;· and that the *owner* was not liable, unless he had requested the services of the physician. (*Meeker vs. Childress, Minor's Rep.* 109.)

And this decision, made at this early period of the history of the Supreme Court of that State, being the first year of its organization, has been acquiesced in and considered as law since that time. See *Gibson vs. Andrews,* (4 *Ala. Rep.* 766.)

Cases from other slave States might be cited. I am content with these which have been adduced—coming, as they do, from our nearest neighbors on both sides, and States whose social condition is so similar, in all respects, with our own.

[4.] That a contrary understanding prevails in some portions of our State, we know to be true ; and one that has originated entirely in considerations of policy. It has been supposed, that slaves that are hired are more likely to be neglected, if the temporary owner is made liable for physician's bills. But we apprehend, that when the whole law regulating this contract is properly understood, that no such consequences will follow.

[5.] It is now settled in this State, that one to whom a slave is hired for a year, is entitled to no abatement of the price, because of the death of the slave, after the commencement of the term. This, of itself, will constitute a strong motive for taking care of the slave ; the hirer seeing that he is bound to pay for the negro, for the time stipulated, living or dead.

Then again, it never has been supposed, I think, that the hirer is entitled to a discount for the loss of the service of the negro hired, on account of sickness, unless it originated in causes existing at the time of the hiring, and which were unknown to the hirer. For all purposes, the law looks upon this

contract as *quasi*, a sale *pro tempore*. All the owner undertakes is, that the negro is sound at the time ; and the hirer takes the chance of his remaining so. And here, again, is a direct appeal to the interest of the hirer, to take care of the slave, that he may be able to perform the service for which he was employed.

[6.] But besides this, and what perhaps is not so well understood, the hirer of a slave is bound to use ordinary diligence in regard to the health of the slave; that is such diligence as a prudent man commonly takes of his own slave, placed in like circumstances. He must not only use ordinary diligence in protecting the slave from danger and disease, but ordinary diligence in discovering disease if it exists; and ordinary diligence in its treatment.

[7.] And failing to perform his duty in this particular, the hirer will not only make himself personally responsible to the owner for what injury results from his neglect, but the owner himself would have the right to supply the necessary medical aid and look to the hirer for remuneration.

In addition to all this, the owner may still furnish any supplementary assistance which he may see fit. Fixing the legal liability upon the hirer, does not preclude him from indulging to any extent, his wishes in this respect. And so far from rejecting his proposed aid, the hirer will be gratified, no doubt, to have him cooperate in curing the slave ; for it is his interest to have all his diseases speedily healed.

Whether this case then is to be determined by the principles of Law or the policy of the Courts, we are well satisfied that this action cannot be maintained. There is no privity of contract between Dr. Alexander and Mr. Latimer. So far as Mr. Latimer was concerned, the services rendered the slave were wholly gratuitous.

And could any case arise, which would better enforce the rightfulness of this doctrine than the present ? This slave was bid off by Dr. Thompson at the beginning of the year, at public outcry at $91. He is employed as a waiter in the hotel of Dr.

Thompson at Atlanta.   A guest is attacked with small pox, and the boy is put to wait on him, and contracts the disease ; for the treatment of which an account is raised, reasonable enough I have no doubt, against Mr. Latimer, as the guardian of an orphan, of $100 !   Mr. Latimer had by the contract of hiring, lost all control over this slave.   He had no right to remove him from exposure to the epidemic, or to prevent him from being placed in contact with it.   And yet when the negro is attacked, without being notified of his situation, living as he did in the vicinity of the place, a physician is called in, and he is made chargeable for a bill exceeding by nine dollars the whole year's hire !   Well might the Court say in this case in 4 *McCord*, " There is no foreseeing the consequences that might result to the *owners* of slaves, if they were made liable for services rendered" under such circumstances.

[8.] We have not decided, nor do we intend to say, that under certain circumstances, the hirer might not have relief against the owner, especially in a Court of Equity, for medical services rendered the slave.   Suppose, for instance, that a disease should exist and develope itself during the term, which might not materially incapacitate the slave from labor during the period for which he was hired, and yet one which, from its character, would not admit of delay or postponement in its treatment until the end of the term.   In such case, it would be manifestly unjust that the whole expense, or even perhaps the greater part should fall on the temporary owner.   He should be entitled to apportionment.

So in the present instance, if the negro contracted a dangerous disease, *without fault on the part of the hirer*, and the case required instant and indispensable assistance, the entire loss should not fall on the hirer, perhaps.   And although primarily liable to the physician, he might go into Chancery and obtain redress, as against the owner, if remediless at Law.

[9.] Upon that point, however, we express no opinion.   For the Law, I know, will not permit a slave, hired as this was, for general and common service, to be employed in any hazardous business, without the consent of the owner.   And if death were

to ensue from such employment, the hirer would make himself liable for the value of the slave.

[10.] Of course it may be made the subject of contract, whether the expenses attendant on the sickness of a slave shall be borne by the master or the person who hires him. But in the absence of any such agreement, we are clear that it is not only in conformity with the abstract principles of law, but of sound policy also to hold the hirer answerable. Not only is the absolute control of the slave surrendered by the master for the time being; but the obligation to supply his daily and hourly wants, would seem necessarily, and in the natural course of things, to be devolved upon the other person, who assumes the absolute possession of the slave.

Our unanimous opinion therefore is, that the judgment be reversed.