[No.  935.]

## THE STATE OF NEVADA, Respondent, *v.* AH CHUEY, alias SAM GOOD, Appellant.

IDENTITY OF PRISONER—EXHIBITION OF TATTOO MARKS UPON THE PERSON—ART. 1, SEC. 8, CONSTITUTION DISCUSSED AND CONSTRUED.—Upon the trial, a question was raised as to the identity of the defendant. One witness testified that he knew the defendant, and knew that he had tattoo marks (a female head and bust) on his right forearm. The court thereupon compelled the defendant, against his objection, to exhibit his arm, in such a manner as to show the marks to the jury: *Held*, that this action of the court was not in violation of the clause in the State Constitution, which declares that no person shall be compelled "in any criminal case, to be a witness against himself;" that it was not prejudicial to defendant and was not erroneous. (Leonard, J., dissenting.)

CORPUS DELICTI—CIRCUMSTANTIAL EVIDENCE—Proof of *corpus delicti* may be shown by circumstantial evidence.

IDEM—SUFFICIENCY OF EVIDENCE.—Where it was shown that the house where the dead body (claimed to be the body of Ah Tong, alleged in the indictment to have been killed by Ah Chuey) was found, was used as a Chinese wash-house ; that Ah Tong was the proprietor ; that he was assisted by two other Chinamen ; that these' three persons were usually at the house ; that the wash-house was being used as usual on the day of the homicide ; that some human being therein was killed ; that the house was consumed by fire after the homicide occurred ; that the body of the deceased was badly charred ; that Ah Tong had never been seen after the homicide, and that the other occupants had been seen and were alive : *Held,* that these circumstances tended to establish the fact that the body found in the wash-house was the body of Ah Tong.

APPEAL from the District Court of the Second Judicial District, Washoe County.

The facts sufficiently appear in the opinion.

*Robert M. Clarke* and *N. Soderberg,* for Appellant.

I. The court erred in compelling defendant to exhibit the tattoo mark on his arm to the jury. This was compelling him to testify against himself. (Cons. of Nevada, sec. 8, 18; Comp. Laws, sec. 2305, 2306; U. S. Dig. 1st series, vol. XIV., p. 693, sec. 4630, 4643, 4659; Cooley's Cons. Lim. (1868), 305; *State* v. *Jacobs,* 5 Jones (N. C.), L. 259; *Rex* v. *Worsenham,* 1 Ld. Raym. R. 705; *Reg.* v. *Mead,* 2 Id. 927; *Rex* v. *Shelly,* 3 Term R. 142; 1 Green. Ev. sec. 451; Whart, Cr. L. sec. 807; 2 Phillips Ev. 929; *Stokes* v. *State* (recent term case), 3 Cent. Law Jour. pp. 316–17, 36 Cal. 529; 123 Mass. 222.

II. There is an entire want of evidence of the *corpus delicti.* The only testimony in the record that Ah Tong is dead, are the extra judicial statements of defendant testified to by a hostile Chinaman, which are entirely improbable and unworthy of credence. (*Smith's case,* 21 Grat. 809; *People* v. *Jones,* 31 Cal. 565; 3 Green. Ev. sec. 30; 1 Whar. Am. Cr. Law, sec. 745 *et seq.; Blackburn* v. *State,* 23 Ohio St. 146; 1 Green. Ev. sec. 217: *People* v. *Hennessy,* 15 Wend. 148; *Stringfellow* v. *State,* 26 Miss. 157, 32 Id. 450; 33 Id., 352; 18 (N. Y.), 179, 189.)

*Wm. Cain, District Attorney of Washoe County,* for Respondent.

I. There was sufficient proof of the *corpus delicti.* (2 Green. Ev., sec. 30; Burrill Cir. Ev., p. 677, *et seq.;* 1 Whart. Cr. Law, secs. 746–7.

II. It is always proper to identify a person by his appearance, marks upon his person, dress, stature, voice, etc. (Wills Cir. Ev.; Burrill's Cir. Ev. 635–7–8; 650.)

By the Court, HAWLEY, J. ·

The constitution of this state declares that no person shall be compelled, "in any criminal case, to be a witness against himself." (Art. 1, sec. 8.)

On the trial of this case the court compelled the defendant, against his objection, to exhibit his arm so as to show certain tattoo marks thereon to the jury (a witness having previously testified that such marks were upon the defendant's arm). Was this compelling the defendant to be a witness against himself? What is meant by the constitutional clause above referred to? Perhaps the best way of answering these questions would be to state the history which led to the adoption of this constitutional provision. A similar provision is found in the constitution of nearly every state of the union and in the constitution of the United States.

In the early history of England accused persons were compelled to testify in answer to any criminal charge brought against them. With the advancing spirit of the age it was claimed that no man ought to be compelled to accuse himself of any crime, and by degrees the rule was changed to its present state in accordance with what seemed to be the public sentiment of the country. Story, in his commentaries on the constitution of the United States, says: That the insertion of this clause "is but an affirmance of the common law privilege." It was, according to his views, adopted to prevent the evils which had resulted from the custom of other countries in compelling criminals to give evidence against themselves and of being "subjected to the rack or torture in order to procure a confession of guilt." (2 Story on the Const. 1788.)

VOL. XIV—6 ·

Blackstone claims that the trial by torture was unknown to the law of England. In referring to this custom he says: "It seems astonishing that this usage of administering the torture should be said to arise from a tenderness to the lives of men; and yet this is the reason given for its introduction in the civil law, and its subsequent adoption by the French and other foreign nations, viz.: because the laws can not endure that any man should die upon the evidence of a false or even a single witness, and, therefore, contrived this method that innocence should manifest itself by a stout denial, or guilt by a plain confession, thus rating a man's virtue by the hardiness of his constitution, and his guilt by the sensibility of his nerves." (4 Black. Com. 326.) This learned commentator, in order to fully expose the fallacy of this reason, quotes, with approval, the language of Tully, that notwithstanding pain governs those tortures, the quæstor rules and regulates as well the mind as the body of every one; desire inclines; hope bribes; fear enfeebles; so that in such a distressed state of things no room is left for the truth. It does, indeed, seem strange, at this day, that a people as intelligent and enlightened as the Romans were did not earlier discover the utter futility of this mode of punishment to extract the truth. It may be, however, that the wisdom of future ages will discover and bring to light the errors of the system which we have adopted in the United States, in order to accomplish that very useful purpose. It has already been assailed by James Fitzjames Stephens, and other prominent and able writers on the criminal law.

I have referred to this subject, not for the purpose of pointing out or expressing any opinion upon the merits or demerits of any particular system, but to show as a fact that in all countries and in all ages, whatever the law or custom may have been, it was always claimed as a reason for its adoption that it was calculated to discover the truth, and thereby promote the ends of justice. Such is claimed to be the rule of our constitution and laws upon this question.

The object of every criminal trial is to ascertain the truth.

The constitution prohibits the state from compelling a defendant to be a witness against himself because it was believed that he might, by the flattery of hope or suspicion of fear, be induced to tell a falsehood.

None of the many reasons urged against the rack or torture or against the rule compelling a man " to be a witness against himself " can be urged against the act of compelling a defendant, upon a criminal trial, to bare his arm in the presence of the jury so as to enable them to discover whether or not a certain mark could be seen imprinted thereon. Such an examination could not, in the very nature of things, lead to a falsehood.   In fact, its only object is to discover the truth; and it would be a sad commentary upon the wisdom of the framers of our Constitution to say that by the adoption of such a clause they have effectually closed the door of investigation tending to establish the truth.

Confessions of persons accused of crime, whenever obtained by the influence of hope or fear, are excluded because in considering the motives which actuate the mind of man they might be induced to make a false statement.   Yet, notwithstanding the universality of this rule of law, whenever the confession, however improperly or illegally obtained, has led to the discovery of any given fact, that fact is always admitted in evidence, because the reasons which would have excluded the confession no longer exist.   This is the governing and controlling principle of the law.

The constitution means just what a fair and reasonable interpretation of its language imports.   No person shall be compelled to be a witness, that is to testify, against himself. To use the common phrase, it "closes the mouth " of the prisoner.   A defendant in a criminal case can not be compelled to give evidence under oath or affirmation or make any statement for the purpose of proving or disproving any question at issue before any tribunal, court, judge or magistrate.   This is the shield under which he is protected by the strong arm of the law, and this protection was given, not for the purpose of evading the truth, but, as before stated, for the reason that in the sound judgment of the men who framed the constitution it was thought that owing

to the weakness of human nature and the various motives that actuate mankind, a defendant accused of crime might be tempted to give testimony against himself that was not true.

*The State* v. *Jacobs*, 5 Jones, N. C. 259, and *Stokes* v. *The State* (an unreported Tennessee case referred to in a note to vol. 1, Wharton's Law of Evidence, sec. 347), have been cited and are relied upon to sustain the position that the act of compelling Ah Chuey to bare his arm was in violation of his constitutional rights.

In the Jacobs case the court decided that " a Judge has not the right to compel a defendant in a criminal prosecution to exhibit himself to the inspection of the jury for the purpose of enabling them to determine his status as a free negro." This decision was based upon two grounds: First, upon the general rule that a witness could not be compelled to furnish any evidence that would tend to criminate himself. Second, that the manner in which the defendant was compelled to exhibit himself was prejudicial to the defendant. I do not propose to deny the correctness of that decision, but I do insist that it can not be sustained upon the first ground stated therein.

In the subsequent case of *The State* v. *Johnson*, 67 N. C. 58, the court, in my opinion, declare the correct principle that governed the Jacobs case and distinguished it from the one then under consideration, viz.: In the Jacobs case the defendant was compelled to exhibit himself to the jury so that the "jury might determine by inspection his quality and condition—his blood or race." That was a matter to be proved by the oath of witnesses who knew the facts, or it may be by experts.

It is a noticeable fact that in none of the subsequent cases in that state, where the Jacobs case was cited, have the courts sanctioned or in any manner approved of the first reasoning upon which the decision was based. Whilst they have taken especial pains to distinguish the facts in the respective cases, they have, without disturbing the decision, virtually refused to acknowledge the reasoning of the court as applicable to cases of a similar character.

In *The State* v. *Woodruff*, 67 N. C. 89, where an issue of bastardy was being tried, the mother of the child, when examined as a witness, held the child in her arms, and the counsel in addressing the jury called attention to its features and commented upon its resemblance to the defendant, the child being still in its mother's arms. This was held not to be error.

Now, how could the jury determine the resemblance, unless they also examined the features of the reputed father? Was he not compelled to furnish evidence against himself by exhibiting his face to the jury? Surely, if the constitution protects a defendant, it could not possibly make any difference whether the defendant exhibited himself in sitting down or standing up; in allowing the jury to look at his features or the color of his hair; to look at a mark plainly visible upon his face or examine marks upon his person concealed by his ordinary clothing. Does he not furnish as much evidence against himself in the one case as the other? Looking, then, at the facts, and applying thereto the principles of common sense, did not Woodruff in the one case furnish more evidence against himself than Jacobs did in the other? If the broad mantle of this provision of the constitution covers the one case, it certainly does the other. But the truth is, that the difference between the cases, as held by the respective courts, relates exclusively to the manner in which the defendant is compelled to exhibit himself, and is not in any way governed or controlled by the constitution.

It was admitted in the oral argument that a jury might look at the features of the defendant and examine marks upon any part of his person not concealed by his ordinary clothing, so long as he was not compelled to exhibit himself to the jury, but it was very earnestly contended that the inspection could go no further; that the defendant, under the facts of this case, could not be compelled to draw up his shirt sleeve so as to exhibit the tattoo mark upon his wrist or forearm, because such an act was compelling the defendant to furnish evidence against himself, in violation of a provision of the constitution.

From a constitutional standpoint, what does this argument amount to? If, in order to establish the identity of any defendant in a criminal case, it became necessary to examine a peculiar mark on the back of his neck, the admissibility of such an examination would, under the rule contended for, depend solely upon the size and style of his shirt collar. If he wore a turn-down collar, the mark would be visible without removing any of his ordinary clothing, and could be examined by the jury; but if he insisted upon the most approved fashion and wore a standing collar, close fitting to the neck, the mark would be concealed by his ordinary clothing and could not be examined.

In another case the defendant's hair might be long enough to conceal any scar upon his neck; but, if he had his hair cut before coming into court, the barber's shears—by clipping his curls—might destroy all protection given by the constitution.

The style of dress which men and women wear is regulated, to some extent, by the custom and fashion of the community where they reside. The admissibility of evidence of this character would, under the sound reasoning and logical view of this rule, fluctuate and change by the peculiar whims, caprice, fashion, or frivolity of the particular community where the defendant is tried. If the defendant is a woman, and the custom is for her sex to go closely veiled whenever appearing in public, if her identity is questioned and made to depend to some extent upon the presence of a peculiar scar upon her cheek, she would, under the sanctity of the constitution, be protected from removing her veil, and the jury would not be allowed to even examine the features of her face.

In *The State* v. *Garrett*, 71 N. C. 85, the defendant was indicted for murder. On the night of the homicide, defendant stated to the persons present that the deceased came to her death by her clothes accidentally catching fire while deceased was asleep, and that she (defendant), in attempting to put out the flames, "burnt one of her hands." At the coroner's inquest, the defendant was compelled to unwrap the hand she stated had been burnt and exhibit it

to a physician there present, "and there was no indication of any burn whatever upon it."

Upon the trial of the case, "the court ruled that anything the prisoner said at the inquest was inadmissible; but that the actual condition of her hand, although she was ordered by the coroner to unwrap it and exhibit to the doctor, was admissible as material evidence to contradict her statement to the witness on the night of the homicide." This ruling was sustained by the supreme court. How is it that the constitution would not reach this case as well as the case of Jacobs? Is it because Jacobs was compelled to exhibit his head in court, whereas Garrett was only compelled to exhibit her hand to a physician at a coroner's inquest? Is the force of the constitutional provision limited to acts within the walls of a court-room? Can it be possible that it has no application out of sight of the particular "temple of justice" where the case is tried? Could a defendant be compelled against his objection to open his mouth and testify upon his preliminary examination before a committing magistrate? Would other witnesses who were present at such examination be allowed to detail upon the trial the testimony so given? Is there not a broad and substantial distinction between the testimony given by a defendant under oath, or statements made under a false promise or improper inducement, upon the one side, and evidence of physical facts obtained from such testimony, or in any other manner, on the other side?

If the constitution was applicable to Jacobs' case, and protected him from being compelled to give evidence against himself by exhibiting his head to the jury, then it ought to have been applied to Garrett's case, and protected her from being compelled to give evidence against herself by exhibiting her hand to the physician at the coroner's inquest.

Take the case of Stokes. The prosecution sought to compel the defendant in the court-room to put his foot in a pan of mud, in order to identify the track thus made with a track found in mud of equal softness and similar character, made by a bare foot near the scene of the homicide. The

court refused to compel the defendant "to put his foot in it." On appeal, the case was reversed because this circumstance might have had an influence on the jury prejudicial to the defendant.

It is argued that the act of the prosecution tended to compel the defendant to make evidence against himself. I am of opinion that too much importance has been attached and too much prominence given to the words "compelled to make evidence against himself." The defendant Stokes, if he was the guilty person, was making evidence against himself when he put his foot in the mud near the scene of the homicide, and when arrested he could have been compelled to put his foot in that track, against his will, and if his foot corresponded with the track, that fact would have been admissible upon the trial of his case. (*State* v. *Graham*, 74 N. C. 646.)

In a case of homicide the defendant makes evidence against himself by being compelled to surrender the weapon with which the offense was committed, for it can always be used as evidence against him. A burglar is compelled to give evidence against himself when he is forced to surrender false keys and other burglarious instruments found in his possession. A counterfeiter is compelled to give evidence against himself when the dies he had manufactured and used are discovered and brought into court for inspection.

The application of the principle sought to be enforced upon the reasoning of the court in Jacobs' case, as being within the protection of the constitution, would, if logically carried out, apply to all these and many other similar cases.

From whatever standpoint this question can be considered, the truth forces itself upon my mind that no evidence of physical facts can, upon any established principle of law, or upon any substantial reason, be held to come within the letter or spirit of the constitution. The question of whether or not the court erred in compelling the defendant Ah Chuey to exhibit his arm must, in my opinion, be determined upon other grounds. Was the defendant compelled to exhibit himself in such a manner

as to unjustly or improperly prejudice his case before the jury? Did the act in question have a tendency to degrade, humiliate, insult or disgrace the defendant? Did the judge, by the act in question, convey to the jury the idea that he believed the defendant to be guilty of the offense charged against him? If either of these questions ought to be answered in the affirmative, then I think the defendant should be granted a new trial. A defendant in a criminal case is entitled to a fair and impartial trial, free from insult or obloquy, and courts cannot be too particular in guarding his personal rights and privileges. He should never be compelled to make any indecent or offensive exhibition of his person for any purpose whatever. The judge presiding at the trial should not express any opinion upon the facts (*State* v. *Tickel*, 13 Nev. 502, and the authorities there cited), or compel the defendant to do any act which would clearly convey to the jury an intimation that the defendant was guilty of the offense charged, or to exhibit himself in such a manner as to prejudice his case before the jury.

The guilt or innocence of the defendant is a question to be determined by the jury, free from any improper influence of any kind or character whatever. The cases of *The State* v. *Jacobs* and *Stokes* v. *The State* are authorities worthy of consideration upon this branch of this case. Every case, however, where these questions arise, must necessarily be decided upon its own peculiar facts and circumstances. It is not shown that there was anything indecent or offensive in the mere exhibition of defendant's arm to the jury. It does not appear to me that such an act would have a tendency to insult, degrade or humiliate the defendant.

After giving to all these questions unusual deliberation, my conclusion is that the act of the court in compelling the defendant to exhibit his arm did not tend, independent of the fact of the tattoo marks being found, to improperly influence or prejudice the defendant's case before the jury.

From time immemorial it has been the custom in this country, sanctioned by the constitution and laws of the

respective states, to identify persons accused of crime by examining the peculiar color of their hair, the peculiarity of their features, conspicuous scars upon their persons, the want of an eye or tooth, "or any other visible defect or mutilation." (Burrill on Circumstantial Evidence, 639–651.) Marks made by wounds upon the person of an offender given with a weapon in the hands of an assaulted party, corresponding with marks visible upon the person of the prisoner, have always been considered as a strong criminating circumstance tending to establish the identity and guilt of the accused person. (Burrill on Circumstantial Evidence, 641.)

In discussing the various means of identifying persons this author says: "There are cases, again, in which the identity being positively sworn to, and as positively denied, the witness resorts to another class of circumstances as tests of the accuracy of his testimony, such as marks upon the person not prominently visible, or even such as are quite concealed by the ordinary clothing, and thus invisible to any but one who has been intimately acquainted with the subject, and who consequently possesses the most complete means of knowing its identity." (Burrill on Circumstantial Evidence, 644.)

Many cases are cited in the books where evidence of this character has been admitted; and, although not always conclusive, it has frequently been very efficacious in enabling juries to satisfactorily determine the disputed question of identity. I shall refer to but one case. Joseph Parker was indicted and tried for bigamy, at the Court of Oyer and Terminer in New York, in 1804, under the name of Thomas Hoag, *alias* Joseph Parker. Numerous witnesses were examined, who stated, in positive terms, that they knew defendant was Thomas Hoag. Many peculiarities in the features, voice, style and habits were testified to; also the fact of "a scar on his forehead, partly covered by his hair, and another scar on his neck." These peculiarities were all observable in the prisoner. On the other hand witnesses were equally positive that the defendant was not Thomas Hoag, but was Joseph Parker. Finally, "among the marks

sworn to have been observed on the person of Thomas Hoag, was a large and visible scar under one of his feet, occasioned by his having trodden on a drawing-knife, which some of the witnesses swore they had seen. This proved to be a decisive circumstance in the prisoner's favor. For, on exhibiting his feet to the jury, not the least mark or scar could be seen upon either." (Burrill on Circumstantial Evidence, 650.)

This case brings to mind another view of the constitutional phase of this question.

Under the law, as it existed for many years in the several states, a defendant was not allowed to testify in his own behalf. If the principle contended for by appellant is correct Parker ought not to have been allowed to exhibit his feet to the jury, because this was allowing him to make evidence in his own behalf. Would any court in christendom, in construing such a law, refuse to allow the defendant to establish a fact in his own favor in the manner allowed in Parker's case?

To illustrate this proposition. Suppose the truth to have been that the defendant in this case was really Sam Good, as he claimed, and not Ah Chuey, as was claimed by the prosecution; that the witness Rhoades was mistaken in his testimony, and that the laws of the State prohibited a defendant from testifying in his own behalf, and the court had refused to allow the defendant to pull up his sleeve so as to exhibit his arm for the purpose of showing as a fact that there was no tattoo mark thereon as testified to by the witness Rhoades. Could such a ruling have been sustained upon the ground that the exhibition of his arm was allowing him to testify in his own behalf? Certainly not. Why? Because that law, as well as the clause of our state constitution, relates to testimony given by the defendant or statements made by him, and can not be applied to prevent the ascertainment of the truth as to the existence or nonexistence of any scar or mark upon the defendant's person by allowing him in the one case or compelling him in the other to exhibit the fact to the jury.

In discussing the questions involved in this case I wish

it to be distinctly understood that it has not been my intention in any manner, shape, or form to deny the correctness of the general and well-established principle of law that a witness can not, either in a civil or criminal case, be compelled to give any testimony which would have a tendency to convict him of any criminal offense. This principle applies as well to the production of letters or documents, the contents of which would tend to criminate him, as to his oral testimony. But of all the numerous authorities upon this point to which my attention has been called, there is but one, that of *The State* v. *Jacobs,* which, in my opinion, has attempted in any way to apply that principle to the facts of a case at all analogous to the one under consideration. I have endeavored to show that the Jacobs case could not be sustained upon that ground, either under the provisions of the constitution or upon any principle of the common law.

One other question remains to be considered. Is there any evidence in the record tending to establish the fact that Ah Tong (the person alleged to have been killed by Ah Chuey) is dead? Proof of the *corpus delicti* may be established by circumstantial evidence, provided it is satisfactory.

"Even in the case of homicide," says Greenleaf, "though ordinarily there ought to be testimony of persons who have seen and identified the body, yet this is not indispensably necessary in cases where the proof of the death is so strong and intense as to produce the full assurance of moral certainty." (3 Green. on Ev., sec. 30.)

Upon the question of the identity of deceased persons, Wharton says: "It may be regarded as settled law that although it is necessary, in a case of murder, that identity should be proved, yet this identity may be shown as effectively by inferences from facts, as from the positive testimony of witnesses who saw the alleged body of the deceased." (Wharton's Law of Homicide, sec. 640.)

It is shown by the testimony of white witnesses that the house where the dead body (claimed by the prosecution to be the body of Ah Tong) was found, was used as a Chinese

wash-house; that Ah Tong was the proprietor; that he was assisted in the business by two other Chinamen; that these three persons were usually at the house; that the wash-house was being used as usual on the day of the homicide; that some human being therein was killed; that the house was consumed by fire after the homicide occurred; that the body of the deceased was badly charred by the fire; that Ah Tong had never been seen after the homicide occurred, and that the other occupants of the house had been seen and were alive.

These circumstances, without referring to any other testimony, tended to establish the fact that the body found in the wash-house was the body of Ah Tong.    This being true, the verdict of the jury establishing the identity will not be disturbed.    (*State* v. *Williams,* 7 Jones, N. C. 446.)    The testimony in the bill of exceptions points directly to the defendant as the person who committed the offense.

I am of opinion that the judgment of the district court ought to be affirmed, and the court below directed to fix a day for carrying the sentence into execution.

It is so ordered.

LEONARD, J., dissenting.

Being unable to concur in the opinion and judgment of the court in this case, I deem it proper to give a more complete statement of the facts presented by the record, to the end that I may more clearly explain the grounds of my dissent.

Defendant was convicted of murder in the first degree for the killing of one Ah Tong, in Reno.

There was testimony admitted on behalf of the state which, without considering defendant's extra-judicial statement, tended, at least, to establish the fact that the defendant and another Chinaman, on the twenty-fourth day of December, 1877, at Reno, killed some human being in a wash-house, and afterwards set fire to the building, and hastily departed while it was in flames.    The remains of the deceased were found, but were so burned and disfigured that identification of the body was im-

possible; and, in fact, none was attempted by the coroner who held an inquest upon the body and buried it.   In addition to the testimony already referred to, Ah Chung, a Chinese witness, after stating that Ah Tong was his cousin, testified to certain statements, claimed to have been made by the defendant in a gambling house in Virginia, on or about January 8, 1878, and overheard by the witness, which were, in substance, that when defendant was gambling and having bad luck witness heard him say, "That money no good;" that another man asked him, "Why the money was no good;" that defendant replied, "Down in Reno he killed Ah Tong;" that he, defendant, bought pepper, and another man threw it, when he, defendant, killed him; that he gave $30 to the man who threw the pepper, and $120 was his share.

It was necessary, of course, for the state to prove not only the *corpus delicti*, the body of the crime charged—that Ah Tong was dead, and that he came to his death by violence inflicted by human agency—but it was also necessary to prove that the defendant, Ah Chuey, was the guilty agent. The state did not pretend that the defendant killed Ah Tong unless he was the same person who, it was claimed, with another Chinaman, set fire to the wash-house after shooting the deceased.

Witnesses testified that the defendant was Ah Chuey, and that he was the same person who went towards the wash-house a few minutes before they heard two or three shots, and that he was one of the two Chinamen who ran away from the house a short time after, when the house was in flames.   But the same witnesses also stated that on the twenty-fourth day of December, 1877, the defendant was a tall, light-complexioned, straight, good-looking Chinaman, while at the trial he was not so in many respects.   There was testimony tending to show that between the date of the homicide and the trial, some of his features, noticeably his mouth, and his complexion, had been greatly changed, either from natural causes or by artificial means.   At any rate, the general appearance of the defendant in court was very different from that of the Chinaman who, it was claimed, killed

Ah Tong, and set fire to the wash-house. It must be borne in mind, also, that defendant denied being Ah Chuey, and gave "Sam Good" as his name. Such being the case, it became a matter of the first importance for the state to identify the defendant, to convince the jury, that although he called himself "Sam Good," and although his appearance had been changed, still he was the veritable Ah Chuey, seen and recognized by the witnesses on the day of the homicide going to and from the scene of the crime. For the purpose stated, S. H. Rhoades was called by the state and testified that he knew defendant by two names: "Tom" and "Ah Chuey;" that he had known him a year or such a matter; that the defendant had marks on his person by which he knew him; that he had an India-ink mark on his right forearm; that he knew him before his arrest; that he saw the mark on his arm in Reno before his arrest; saw him twice after, once in Reno and once in the district court in Virginia; that the mark was a female head and bust.

The district attorney then directed the defendant to exhibit his arm. His counsel "objected to the defendant being exhibited as a witness against himself, or being compelled to make an exhibition of himself as a witness against himself; that such evidence was incompetent." The court overruled the objection and defendant excepted. Defendant was then brought before the jury by the sheriff and made to exhibit his arm, which was tattooed as described by the witness.

The court's ruling in this connection is claimed to be error.

That a defendant in a criminal action can not be compelled to be a witness against himself is not questioned by counsel for the state, nor by the court; and the inquiry before us is, whether or not the compulsion complained of deprived defendant of a substantial right secured by the constitution and laws, statute and common. Had the district attorney asked the defendant whether he had on his right forearm the tattoo mark described, and had the court, against defendant's consent, compelled him to answer that he had such mark, there can be no doubt that such action

would have been a grave error. Could the court at the trial, in the presence of the jury, by other forcible means, accomplish indirectly what it could not do by direct means? Was the compulsion complained of an infringement of the spirit of the common law and the constitution? The fact which the state desired to establish for the purpose of defendant's identification, was the existence of the mark described. There were three possible, if not proper, methods of establishing the desired fact to the satisfaction of the jury: By the testimony of witnesses who had seen the mark, the voluntary or involuntary admission of defendant that he had such mark, and by an actual inspection by the jury. The latter method was adopted in part, without the defendant's consent, and after the ruling of the court upon the competency and propriety of such method of proof, it must be admitted to have been as convincing to the jury of the fact sought to be proved as any evidence which might have resulted from either of the other methods named could possibly have been. That it would have been competent to prove the fact sought by the first method—the testimony of witnesses other than the defendant—or by the voluntary admission of the defendant, there can be no doubt. That an involuntary admission or statement of the fact by defendant before the jury would not have been competent or proper, is just as certain. We arrive then at the inevitable conclusion that a result as detrimental to defendant was reached by the method adopted, as could have come from either of the proper methods mentioned, or by the one admitted to be improper. In other words, compelling defendant to exhibit the mark to the jury, established the desired fact as conclusively, at least, as the competent testimony of witnesses, or a voluntary or compulsory admission of defendant, could have done.

So far as I am able to ascertain the fact, every state in the Union has a provision in its constitution protecting persons accused of a crime from criminating themselves, except New Jersey, Georgia and Iowa. It seems from *Higdon* v. *Heard*, 14 Geo. 259, that the former constitution of that state had a provision like ours; but in the new constitution, adopted

in 1868, I find none.   In some of the states the provision is like ours that "no person in a criminal case shall be compelled to be a witness against himself."   In others, that such person shall not be compelled to give evidence against himself."   In others, that such person "shall not be compelled to testify against himself."   In Kansas it is that "no person shall be a witness against himself."   In others, that "no person in a criminal case shall be compelled to furnish or give evidence against himself."   In Maryland, that "no man ought to be compelled to give evidence against himself."   In Rhode Island, that "no man in a court of common law shall be compelled to give evidence criminating himself."   I have no doubt that the intention of the different states in adopting these provisions was the same; and yet, technically, some give greater protection than others.   Prohibiting a person from being compelled to give evidence, is certainly the same as a prohibition against compelling him to be a witness.   But strictly speaking, the provision that "no person in a criminal case shall be compelled to testify against himself" affords less protection than either of the others just mentioned.

As I understand, the court construes the clause in question of our constitution as though it read: "No person, etc., shall be compelled to testify or make any statement against himself;" and that it gives the accused no other protection except from acts "which have a tendency to degrade, humiliate, insult or disgrace" him.   I quote from the decision: "The constitution means just what a fair and reasonable interpretation of its language imports.   No person shall be compelled to be a witness, that is, to testify against himself.   To use the common phrase, it 'closes the mouth of the prisoner.'   A defendant in a criminal case can not be compelled to give evidence under oath or affirmation for the purpose of proving or disproving any question at issue before any tribunal, court, judge, or magistrate.   This is the shield under which he is protected by the strong arm of the law, and this protection was given, not for the purpose of evading the truth, but, as before stated, for the sole reason that in the sound judgment of the men who framed

the constitution, it was thought that owing to the weakness of human nature and the various motives that actuate mankind, a defendant accused of crime might be tempted to give testimony against himself that was not true." Again, the court says: *      *      * " In all countries and in all ages, whatever the law or custom may have been, it was always claimed as a reason for its adoption that it was calculated to discover the truth, and thereby promote the ends of justice. Such is claimed to be the rule of our constitution and laws upon this question."

In my opinion, the court has not stated the only reason why the provision in question was placed in the constitution. Had that been the only one, there would have been a prohibition against allowing a defendant to testify for himself; because in the latter case there was and is a hundred-fold more danger of falsehood that in the former. Is there not an additional reason why this provision was adopted? Was it not, in part at least, because of the enlightened spirit of the age, that a man accused of a crime should not be compelled to furnish evidence of any kind which might tend to his conviction? Did it not come, to some extent, from the spirit of justice and humanity which established the first of all legal presumptions—that every person shall be considered innocent until proved guilty? (See *Wilkins* v. *Malone,* 14 Ind. 156.) Mr. Starkie says: " Upon a principle of humanity, as well as of policy, every witness is protected from answering questions by doing which he would criminate himself; of policy because it would place the witness under the strongest temptation to commit the crime of perjury; and of humanity, because it would be to extort a confession of the truth by a kind of duress, every species and degree of which the law abhors." (Starkie on Evidence, 40.) It will be noticed that the author says " a witness is protected from answering questions," etc., which, I admit, does not, in terms, cover this case; but I quote it for the purpose of showing, from him, that the reason why the provision of the constitution under consideration was inserted was not solely to prevent the accused from stating a falsehood, whether for or against himself.

In 1853 the constitution of Arkansas provided that "in all criminal prosecutions the accused shall not be compelled to give evidence against himself." In the present constitution the provision is the same as ours. To give evidence is certainly to be a witness, and there is no substantial difference between them. In construing the provision in the old constitution (*State* v. *Quarles*, 13 Ark. 309) the court said: "This places a restriction upon the power of the legislature to the extent that no law can be enacted by that body to compel one accused to give evidence against himself, and by necessary implication also prohibits any law by which a witness in any prosecution should be compelled to disclose criminal matters against himself, so long as it might remain lawful that such disclosures could be afterwards produced in evidence against him in case he in turn should be the accused party. Hence it seems inevitable that, although witnesses are not expressed in the terms of the provision of the bill of rights that we are considering, yet they are substantially embraced to the full extent of a complete guarantee against self-accusation. Consequently, so long as the common law rule might prevail, that voluntary disclosures of a witness in a criminal prosecution may be used in evidence in an after prosecution against him, when he in turn had become the accused party, he would be as much entitled to this guarantee when interrogated as a witness as the accused party." The books are full of the same doctrine. (*People* v. *Hackley*, 24 N. Y. 75.)

In Wharton's Law of Evidence, section 536, it is said that "a witness cannot be compelled to give a link to a chain of evidence by which his conviction of a criminal offense can be insured;" and, also, section 731, "What is elsewhere said as to the protection of witnesses from questions which call for criminatory answers, applies to the production of criminatory documents. Neither equity nor common-law practice will compel a person to allow the inspection of either public or private documents in his custody, where the document, if produced, would criminate the party producing." (See also section 533.) And

in Taylor's Law of Evidence, the author says in section 1351: "In accordance with the invariable rule which protects a witness or party from being compelled to furnish evidence that may expose him to a criminal charge, neither the court of queen's bench nor the court of chancery will ever oblige a person to allow the inspection of either public or private documents in his custody, where the inspection is sought for the purpose of supporting a prosecution against himself." In *Regina* v. *Mead*, 2 Ld. Raymond, the defendant and others were incorporated by the name of the surveyors of highways and were trustees of a charity. An information was preferred against the defendant for executing this office without having taken the oath as required by statute. The defendant pleaded not guilty. Counsel for the prosecution moved for a rule, that the prosecutor might have two books produced which these surveyors kept, in which they entered their elections, and also their receipts and disbursements, and that he might take copies of what he thought necessary, and that the books might be produced at the next assizes at the trial. "But *per curiam* denied, because they are perfectly of a private nature, and it would be to make a man produce evidence against himself in a criminal prosecution." (See also *Dominus Rex* v. *Cornelius et al.*, 2 Strange, 1210; 24 How. Pr. 21, *Bank* v. *Trapp*.)

If the reason stated by the court is the only one why the accused is not compelled to be a witness against himself, why is it that neither himself, nor an ordinary witness even, can be compelled either to testify or to produce any criminatory book or document? The book or paper cannot be falsified—it speaks for itself, just as did the mark on defendant's arm. Cannot "the many reasons urged against the rack or torture or against the rule compelling a man to be a witness against himself" be urged as well, and with the same propriety, against compelling criminating disclosures by the exhibition of physical peculiarities, as against the production of criminatory documents?

I think the framers of the constitution and the people who adopted it intended that at criminal trials the accused,

if such should be his wish, should not only have the right to close his mouth, but that he might fold his arms as well, and refuse to be a witness against himself in any sense or to any extent, by furnishing or giving evidence against himself, whether testimony under oath or affirmation, or confessions or admissions without either, or proofs of a physical nature. A witness is often required to appear in court by *subpœna duces tecum,* simply for the production of a book or paper, with no intention on the part of the person calling him of having him testify, and yet he is a witness and can be punished for contempt if he wrongfully disobeys. He must submit the document to the inspection of the court, but if it will tend to criminate him it can not be used. (See authorities before cited and Mitchell's case, 12 Abb. Pr. 258.) But aside from the constitution and the reason for the adoption of the provision under consideration, there is an additional reason why, in my opinion, the construction given by the court is incorrect. Judge Cooley, in his excellent work on Const. Limitations, says: "A constitution is not the beginning of a community nor the origin of private rights; it is not the fountain of law nor the incipient state of government; it is not the cause, but consequence, of personal and political freedom; it grants no rights to the people, but is the creature of their power, the instrument of their convenience." * * * "A written constitution is, in every instance, a limitation upon the powers of government in the hands of agents; for there never was a written republican constitution which delegated to functionaries all the latent powers which lie dormant in every nation, and are boundless in extent and incapable of definition." (Marg. p. 37, 3d ed.) It is common to insert in constitutions, as a matter of extraordinary though probably useless precaution, a provision that the enumeration of rights therein shall not be construed to, impair or deny others retained by the people.

Mr. Cooley says, also (Marg. p. 61), that * * * "the constitutions are to be construed in the light of the common law, and of the fact that its rules are still left in force. By this we do not mean that the common law is to control the

constitution, or that the latter is to be warped and perverted in its meaning in order that no inroads, or as few as possible, may be made in the system of common law rules, but only that for its definitions we are to draw from that great fountain, and that in judging what it means we are to keep in mind that it is not the beginning of law for the state, but that it assumes the existence of a well-understood system, which is still to remain in force and be administered, but under such limitations and restrictions as that instrument imposes."

Can there be any doubt that, under the common law, no person was compelled either to accuse himself or to criminate himself?

In *State* v. *Quarles*, 13 Ark. 311, in commenting upon the constitutional provision, that "no person in a criminal case should be compelled to give evidence against himself," the court uses this language: "The privilege in question, in its greatest scope, as allowed by common law, and no one, be he witness or accused, can pretend to claim it beyond its scope of common law, never did contemplate that the witness might not be proved guilty of the very crime about which he may be called to testify; but only that the witness should not be compelled to produce the evidence to prove himself guilty of that crime. His privilege, therefore, was not an exemption from the consequences of a crime that he might have committed, but only an exemption from the necessity of producing the evidence to establish his own crime."

In Emery's case, 107 Massachusetts, 181, the court says, in relation to a provision similar to that in our constitution: "The principle applies equally to any compulsory disclosure of guilt by the offender himself, whether sought directly as the object of the inquiry, or indirectly and incidentally for the purpose of establishing facts involved in an issue between other parties.   *   *   *   This branch of the constitutional exemption corresponds with the common law maxim, *nemo tenetur seipsum accusare,* the interpretation and application of which has always been in accordance with what has just been stated."

In *Mitchell's case*, 12 Abb. Pr. 258, it is said: "The principle of exemption was applied in its broadest extent to parties to actions at law, who could not be compelled to give evidence; and in respect to the production of documentary testimony, as a party to the action was not bound to give evidence, he could not be required to produce papers to be used against him as evidence." And so, in *Latimer* v. *Alexander*, 14 Ga. 259, this language appears: "The constitution declares that no person shall be compelled, in any criminal case, to be a witness against himself. Literally the constitution does not go as far as the common law, but its spirit and intent cover the whole ground. By it all persons are protected from furnishing evidence against themselves which may tend to subject them to criminal prosecution." And in *Wilkins* v. *Malone*, 14 Ind. 156: "The constitutional provision in question is thoroughly interwoven with the history and principles of the common law. It exempts no one from the consequences of a crime committed, but only from the necessity of himself producing the evidence to establish it. 'It is founded upon the general sense of enlightened man, that compulsory self-accusation of crime is not only at war with the true charities of religion, but has been proved to be impolitic by the truths of history and the experience of common life.'" I think the construction placed upon this clause of our constitution so limits the practical effects and benefits to be derived therefrom, that in this case the defendant will be deprived of a right guaranteed to him by the spirit and letter of the constitution and common law, and as a result many a defendant may be compelled to criminate himself as completely as would be the case if he should be compelled to utter words establishing his guilt. I am satisfied that the framers of that instrument and the people who adopted it did not intend that a principle which has so long excited the admiration of the most enlightened nations, and been regarded as one of the grandest monuments of liberty and humanity, should be disregarded or forgotten in the administration of criminal law. I am also unwilling to admit that the people of this state have embodied in their

fundamental law a principle against which, in darker periods, less enlightened people have hurled their righteous anathemas. I think, also, the court is in error in deciding the case upon the constitutional provision without reference to the common law, if such a construction must be placed upon the constitutional provision under consideration.

It is undoubtedly true, as stated by the court, that a fact tending to show guilt may be proved, although it was brought to light by reason of a declaration or confession inadmissible *per se,* as having been obtained by improper influences. (1 Greenleaf's Ev., sec. 231; *State* v. *Garrett,* 71 N. C. 87.) Voluntary confessions are received in evidence, no matter where made, because it is presumed that persons accused of crime will not confess against their own interest, unless the confessions are true. Involuntary confessions, or those induced by some fear of personal injury or hope of personal benefit, at least by those in authority, are not received, because they cannot be depended upon as the truth. "A free and voluntary confession," says Eyre, C. B., "is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt, and therefore it is admitted as proof of the crime to which it refers; but a confession forced from the mind by the flattery of hope or by the torture of fear comes in so questionable a shape, when it is to be considered as the evidence of guilt, that no credit ought to be given to it, and therefore it is rejected." (Greenleaf on Ev., vol. 1, 248.) Facts ascertained from an involuntary confession are received as evidence of guilt, because, although the confession alone could not be taken as true, yet the fact resulting therefrom cannot be false. But involuntary confessions made out of court are not rejected because of the constitutional provision under consideration. (See same vol. Greenleaf's Ev. p. 242 *et seq.*) This rule of law was established long before the constitution of the United States was adopted, and it does not depend upon any constitution for its existence or continuance. Such confessions are excluded upon the theory that the promises, threats or inducements held out, so overcome the mind of the accused that he is liable to speak falsely. Consequently they are excluded,

although they may oftentimes be entirely true. That is the reason, and the only one, why involuntary confessions made elsewhere than before a tribunal authorized by law to act in the premises, are rejected. If such confessions could be depended upon as the truth, they would be received the same as facts resulting therefrom, or as confessions voluntarily given. If they could be depended upon as the truth, courts would then refuse to inquire how they were obtained, as now they refuse to inquire how facts resulting from an involuntary confession were obtained. So, answering questions propounded by the court, my opinion is that the force of the constitutional provision is limited to the acts of some court, commission, legislature, or body created by and responsible to the law, having power to make inquiries or decide issues, or to take and preserve evidence for such purposes. I have no hesitation in expressing an opinion that this provision does not cover, or intend to cover, or apply to, the acts of persons who are responsible to the law, but for whose acts the law is not responsible.

In *Emery's case, supra,* the first question raised was, whether the constitutional privilege of exemption relied on was applicable to investigations ordered and conducted by the legislature, or either of its branches. In its decision the court said: " By the narrowest construction, this prohibition extends to all investigations of an inquisitorial nature instituted for the purpose of discovering crime, or the perpetrators of crime, by putting suspected parties upon their examination in respect thereto, in any manner, although not in the course of any pending prosecution. But it is not even thus limited. The principle applies equally to any compulsory disclosure of his guilt by the offender himself, whether sought directly as the object of the inquiry, or indirectly and incidentally, for the purpose of establishing facts involved in an issue between other parties." (107 Mass. 181.) In *Doe dem. Earl of Egremont* v. *Date,* 43 E. C. L. R. 892, I find a remark from Lord Denman, C. J., which, although *obiter,* is entitled to some consideration, at least. He says: " A party to a suit has a right to insist that no evidence shall be produced against him, except

such as can be given legally. Now, if a witness be compelled by the judge at *nisi prius* to produce a title deed which he is legally entitled to withhold, it strikes me that the party to the suit against whom the evidence is produced is affected by that which ought not to have been laid before the jury. One sees that such a question might become of the utmost importance in criminal cases. I consider the authority which the judge exercises to differ materially from that exercised by persons for whom the law is not strictly responsible."

It is undoubtedly true that the evident intent and spirit of the constitution upon this subject is in harmony with the common law; but I have endeavored to show that the protection given to accused persons does not necessarily depend upon the constitutional provision. Several of the states, as we have seen, have no such provision, and yet the common law rule is the same there as here, if in force, and protects all persons from criminating themselves against their will. At a criminal trial, courts cannot take notice of the manner of obtaining evidence out of court. If it is competent and pertinent to the issue, it will be received. If it is a forced confession alone, it will not be admitted in evidence for the reason stated above. If the confession has led to a fact that cannot be false, it will be received for that reason; but I insist that the same rule does not obtain in court, in relation to facts there disclosed by an involuntary confession, or by any compulsory disclosure tending to criminate the defendant. Suppose the proof in this case had been that defendant killed some human being, and that he had voluntarily told another Chinaman that he killed Ah Tong and buried him, without stating the place of burial; that the state, having been fearful that the jury would not believe the Chinese witness, asked the court to order the defendant to go with the sheriff and point out the body; that the court so ordered, and, against defendant's consent, compelled him to obey; that the body was pointed out, that fact having been testified to by the sheriff, and the defendant convicted. If the body had not been found, it would have been error, because the compulsion might have

prejudiced the minds of the jury against the defendant.
But, inasmuch as it was found, I am unable to perceive,
from the theory of the court, why such practice would not
have been proper, because the result—the fact found—could
not have been false, and it would have tended to prove the
confession true.

Suppose, again, that a person is accused of stealing a
gold bar.   The defendant goes upon his trial before it is
found.   The state proves the larceny and many facts tend-
ing to show defendant's guilt.   A witness testifies to facts
showing almost, but not quite, conclusively, that defendant
has the bullion conce led about his premises.   Thereupon,
at the request of the district attorney, the court states to
the defendant that there has been testimony concerning his
possession of the bullion, but of the fact he neither has an
opinion nor expresses any; that he will instruct the jury
that the order he is about to make is no indication that he
considers the defendant guilty, and that they must so con-
sider it.   Thereupon the court says to the defendant:   "If
you have the bullion, and will point it out and deliver it to
the sheriff, I will give you a light sentence in case you are
convicted; and if you will not do so, should the jury find
you guilty, I will give you the full punishment allowed by
law."   The defendant delivers the bullion to the sheriff, the
jury is charged as promised, and a conviction follows.   Is
there any doubt that such conduct on the part of the court
would be error?   Still, in neither of the supposed cases is
the defendant required to speak or testify, and in both
there is no opportunity or object to falsify.   The finding of
the body and the bullion tell their own tales.   In both
cases hope and fear may have induced the confession or
discovery, but in both the discovery shows evidence of guilt
which can not be falsified or simulated.

If witness Rhoades had testified that he knew the
defendant was Ah Chuey, because he was a good English
writer and had for years kept a diary; that he wrote in it
every day and signed his name, "Ah Chuey," to each entry;
that he saw the book a few minutes before coming into
court; that defendant then had the book upon his person,

would any one say that the court, without error, could have compelled him to show the book to the jury? And yet, why not on principle, if he could be compelled to exhibit a private, harmless mark for the same purpose? The object would have been to ascertain the truth, and the result would have verified the statement. Suppose, instead of the head and bust of a woman, he had written upon his breast, in India ink, the words, "I am Ah Chuey;" why could those words be shown with more propriety than the words in the diary, and could they not have been shown if it was proper to compel him to exhibit the mark?

In *Commonwealth* v. *Dana*, 2 Met. 337, the defendant was indicted for an alleged violation of the statute prohibiting the sale of lottery tickets, or the possession of the same with intent to sell, or to offer them for sale, or the aiding and assisting in any such sale. In support of the issue joined in the case, the commonwealth offered in evidence the copy of a search warrant issued from the police court, to the admission of which defendant objected on the ground that the same had been issued improvidently and was void in law. I quote a part of the decision:

"Again, it has been urged that the seizure of the lottery tickets and material for a lottery, for the purpose of using them as evidence against the defendant, is virtually compelling him to furnish evidence against himself, in violation of another article in the declaration of rights. But the right of search and seizure does not depend on the question whether the papers or property seized were intended to be used in evidence against the offender or not. The possession of lottery tickets with the intent to sell them was a violation of law. The defendant's possession, therefore, was unlawful, and the tickets were liable to seizure as belonging to the *corpus delicti*, or for the purpose of preventing any further violation of law. * * * There is another conclusive answer to all these objections. Admitting that the lottery tickets were illegally seized, still this is no legal objection to the admission of them in evidence. If the search warrant was illegal, or if the officer serving the warrant exceeded his authority, the party on whose

complaint the warrant issued, or the officer, would be responsible for the wrong done; but this is no good reason for excluding the papers seized as evidence, if they were pertinent to the issue, as they unquestionably were.   When papers are offered in evidence the court can take no notice how they were obtained, whether lawfully or unlawfully, nor would they form a collateral issue to determine that question.   This point was decided in the cases of *Legatt* v. *Tollervy,* 14 East. 302, and *Jordan* v. *Lewis,* 14 East. 306, note; and we are entirely satisfied that the principle on which these cases were decided is sound and well established." Mr. Greenleaf lays down the same doctrine in his work on evidence.

The rule that I contend for does not, in its practical application, depend upon the length of hair, the style of the shirt collar, or any other peculiarity of dress.   "In cases of felony, where the prisoner's life or liberty is in peril, he has the right to be present, and must be present, during the whole of the trial and until the final judgment. If he be absent, either in prison or by escape, there is a want of jurisdiction over the person, and the court cannot proceed with the trial or receive the verdict or pronounce the final judgment." (Cooley's Cons. Lim. 318; *State* v. *Johnson,* 67 N. C. 59.)

Had the identifying mark been upon some portion of the body not concealed, and had the jury seen it by reason of the defendant's presence in court, I do not say they could not have acted upon the fact so observed.   What I say is, that whether the mark is concealed or not, the court can not compel a defendant, for the purpose of identification, or any other, the tendency of which is to criminate, to exhibit himself or any part of himself before the jury as a link in the chain of evidence.

An accused person can not be compelled to discover a fact while on trial, nor can he be compelled to be an unwilling instrument of discovery or proof after the discovery has been made by other evidence.   He may refuse to plead even, and instead of making such refusal evidence of guilt the law provides that the plea of "not guilty" shall be en-

tered. Had the defendant been accused of a misdemeanor only, his presence in court would have been unnecessary. Under such circumstancs, had he elected to remain absent from the trial, I have no hesitation in expressing an opinion that it would have been error had the court caused the sheriff to bring him into court against his will, and there exhibit the mark; nor do I think the fact that he was required to be present in court in any manner abridged the right which he would otherwise have had.

But few decided cases have been found by counsel, the court, or myself, wherein the question involved in this case has been decided directly, but all that have come under my notice sustain the conclusion to which I have arrived and endeavored to express. The first case is *State* v. *Jacobs,* referred to by the court. In commenting upon that case, the court says it was decided upon two grounds, the second of which was that "the manner in which the defendant was compelled to exhibit himself was prejudicial to the defendant." It is not apparent from the decision that the defendant was treated indecorously or in any way prejudicial to his case, except that he was compelled to go before the jury and submit to their inspection. This is what that court said in relation to the manner: "Another argument of more weight is that the testimony when afforded to the jury is not incompetent, though it might have been an act of tyranny in the court to compel it. But this argument proves too much, and would be equally available if admitted in favor of the competency of a deed, or other private paper, which the court might wrongfully have compelled a defendant to produce. Surely, in such a case, the manner in which the deed or paper was produced and offered would be error, although the deed or paper, if fairly brought before the jury, would be competent evidence." I submit that the "manner" spoken of by the court referred only to the fact that the defendant was compelled to exhibit himself, and thus furnish evidence against himself; that proof of his *status* as a free negro, by him, was incompetent, while if the same fact had been proven by other persons who knew him, such proof would have been competent. If such is the case, then the

second ground of reversal stated by the court was only
stating the first ground in a different way.   In my opinion
the only point decided in that case was that it was error to
compel the defendant to exhibit himself before the jury for
the purpose of showing that he was a negro.   The next
case is the *State* v. *Johnson,* 67 N. C. 57.   The indictment
charged Johnson, a colored man, with ravishing Susan
Thompson.   When she was on the stand as a witness for the
state she was asked by the solicitor to look around the court-
room and see if she could see the man who committed the
rape on her.   She pointed to the defendant and said, "That
is the black rascal."   It was insisted by the defendant's
counsel that this was making the prisoner furnish evidence
against himself.   The court say: "In support of his ob-
jection the prisoner relied upon *State* v. *Jacobs,* in which it
was decided that the defendant could not be compelled to
exhibit himself to the jury that they might see whether he
was within the prohibited degree of color.   But that case
is not like this.   There he was compelled to exhibit himself
to the jury, that the jury might determine, by inspection,
his quality and condition, his blood or race.   That was a
matter to be proved by the oath of witnesses who knew the
facts, or, it may be, by experts.   And although the defend-
ant could not be compelled to exhibit himself to the jury,
yet it would be competent for witnesses who knew him to
speak of his color and of any facts within their knowledge,
and to point to him as being the identical person of whom
they were speaking."   Suppose it was a matter to be proved
by the oath of witnesses or by experts.   Was it any the less
error to compel the defendant to exhibit himself to the jury
and supply the place of other witnesses?   It will be noticed
that in Johnson's case the court reiterates what was decided
in the Jacobs case, that "defendant could not be compelled
to exhibit himself to the jury."

The next case is *State* v. *Woodruff,* 67 N. C. 90.   In that
case, as in Johnson's, I draw attention to the fact that the
defendant was not exhibited before the jury.   He sat in his
place, as he had a right, and was obliged, to do.   The bastard
child was exhibited, or rather held in its mother's arms

while she was testifying, and in his address to the jury the solicitor called attention to the child's features and commented upon its appearance, the child being still before the jury. I have nothing additional to add in relation to the right of the state to have the defendant accused of felony present in court, and the right of the jury to observe him while there; and in case of misdemeanor the right is the same if he voluntarily appears in court. Certainly the solicitor had the right to call the attention of the jury to the child's features, and that was all he did do. At any rate, the defendant was not disturbed in any manner, and if the jury gathered any additional information as to his appearance, it was the result of necessity in giving him his constitutional right to be present in court; it was not the result of compulsion by the court. Besides, if, in truth, in the Jacobs case, it did no good or harm to parade him before the jury, if they discovered nothing but what they knew before he was exhibited, still those facts would not have changed the result in the appellate court. That court could not have known that the error, if such it was, was harmless.

"It is the capability of abuse, and not the probability of it, which is to be regarded in judging of the reasons which lie at the foundation, and guide in the interpretation, of such constitutional restrictions." (Emery's Case, 107 Mass. 183).

To show that the court in Woodruff's case recognized the distinction that I am endeavoring to make between exhibiting the defendant, as was done in the Jacobs case, and allowing him to sit undisturbed in the presence of the jury, as was done in the Woodruff case, and to show by implication that the court still adhered to the opinion in the Jacobs case, I quote a few lines from the decision: " *The State* v. *Jacobs* has been argued as an authority to show error in this case, as if the court had ordered the defendant to stand up and exhibit himself before the jury, as was done in Jacobs' case. But the record shows no such thing, and, therefore, the argument founded on that supposition fails."

*The State* v. *Garrett* is the next case. The fact is not that the defendant was compelled to unwrap her hand and

exhibit it to a physician before the coroner's jury, as such, although it was done in their presence. The jury had rendered their verdict against her before she was compelled to show her hand. Whether she could have been compelled to exhibit her hand while the jury were acting, and before their verdict, is not in the case, and that fact, at least, must appear before it can be claimed that the Garrett case should have been governed by the controlling principle enunciated in the Jacobs case. Compelling the defendant to show her hand after the verdict against her, did not change the verdict, and the effect of a disclosure at that time, and under such circumstances, was the same as though it had been compelled by any of the spectators present. At the trial the defendant objected to evidence as to the condition of her hand, and relied upon the Jacobs case. The court said: "The distinction between that and our case is, that in Jacobs' case, the prisoner himself, on trial, was compelled to exhibit himself to the jury, that they might see that he was within the prohibited degree of color, thus he was forced to become a witness against himself. This was held to be error. In our case, not the prisoner, but the *witnesses*, were called to prove what they saw upon inspecting the prisoner's hand, although that inspection was obtained by intimidation."

The Stokes case is the next. There the court said: "In the presence of the jury the defendant was asked to make evidence against himself;" that is, he was asked to take off his boot and make a new track to be compared with the one found near the scene of crime. I am unable to perceive how it would have been less erroneous to have asked him, in the presence of the jury, to place his foot in the track already made, or to take off his boot and show his bare foot for the same purpose. In either case the defendant would have been asked to furnish a factor necessary in arriving at a conclusion whether or not his foot made the track found near the place of homicide, and inferentially, whether or not he was the guilty party. The method adopted might have been more convincing to the jury than either of the

others mentioned had the court held it proper, but I fail to see how it was more erroneous.

I find nothing in the quotation made by the court from Story and Blackstone against the views I entertain. Judge Story says the insertion of this clause "is but an affirmance of the common law privilege;" that it was adopted to prevent the evils which had resulted from the custom of other countries in compelling criminals to give evidence against themselves, and of being subjected to the rack or torture in order to procure a confession. A part of the object then was to prevent the giving of compulsory evidence. Surely, that is not confined to testimony or statements coming from the mouths of witnesses or accused persons. As to Hoag's case, referred to by the court, it is enough to say that it is evident from the text that his foot was exhibited to the jury by the defendant himself. Besides, the result was entirely in his favor and he was acquitted. Mr. Burrill does not intimate, nor does any other text writer, so far as I am able to find, that it would have been competent for the state to have compelled the prisoner to show his foot in court in aid of the prosecution. If the law of New York had not allowed Hoag to testify in his own behalf, and had the law been the same in this state at the time of the defendant's trial, I agree with the court that at his own request, the first could have exhibited his foot, and the last his arm, to the jury. But my conclusions from those facts are very different from those arrived at by the court. The reason why they would have been allowed to do so is because the reasons for the law's exclusion of testimony would not have existed in relation to proofs offered by them independently of their testimony. Self-interest might have prompted them to commit perjury if allowed to testify; hence, under the old rule, they would have been excluded as witnesses. But as to physical peculiarities, the reason of the rule, and hence the rule itself, would have failed. I am unable to understand why the constitutional provision, that "no person shall be compelled to be a witness against himself in a criminal case," should be construed as relating solely to testimony given, or a statement made by him, because,

under a law not allowing him to testify, he may exhibit himself for the purpose of proving a physical peculiarity independently of any testimony.

My conclusion is that under both the constitution and the common law, it was error to compel the defendant, at the trial, to make a disclosure which, with the testimony of witnesses, tended to prove him to be Ah Chuey, and indirectly to establish his guilt. I think the error is as great as it would have been had the court compelled the defendant to admit that he was Ah Chuey. It accomplished the same result. In criminal cases the state must prove guilt without the aid of the accused at the trial, unless the guaranteed rights are waived, when a waiver is permissible.

I therefore dissent from the opinion of the court.