THE STATE v. WOODWORTH.

1. **Bastardy**: EVIDENCE OF PATERNITY OF FORMER BASTARD CHILD. In an action for bastardy, where the complainant has been guilty of illicit intercourse with a man other than the defendant, it is competent to show such fact as a circumstance to be used in corroboration of the defendant; and this fact may become very important, if it is shown who the other man was, and that his intimacies and opportunities continued until after the child in question was begotten. And so, where the complainant was the mother of another bastard child, born some fourteen months prior to the one in question, it was competent, under the facts of this case, (see opinion,) to ask her, when on the stand, who the father of the first child was.

2. **Evidence**: OF BAD MORAL CHARACTER TO IMPEACH WITNESS: REBUTTING. Where the state, for the purpose of impeaching one of defendant's witnesses, had introduced evidence of the general bad moral character of the witness, and the defendant, on cross-examination, had drawn out the fact that the bad reports against the witness were based upon certain suspicions, it was not competent for defendant to go further, and, by evidence in chief, show that such suspicions were without foundation.

3. ——: ——: ——. While it is true that evidence of particular immoral acts cannot be given for the purpose of impeaching a witness' general moral character, yet, where there has been evidence that the general reputation of a witness is bad, it cannot be said, as a matter of law, that such proof is insufficient to establish bad moral character, simply because, on cross-examination, it appears that his bad reputation is limited to some particular vice. It is the province of the jury, in such case, to determine the weight and effect to be given to the whole testimony relating to the witness' moral character.

*Appeal from Cedar District Court.*

WEDNESDAY, DECEMBER 3.

THE plaintiff was charged with being the father of a bastard child born to one Minnie Mansfield. There was a verdict against the defendant, and judgment was rendered thereon. He appeals.

*A. J. Monroe* and *Sheean & McCarn*, for appellant.

*J. H. Preston* and *Herrick & Doxsee*, for appellee.

ADAMS, J.—I. The child in question was born on the first day of June, 1883. The complainant, as appeared from her testimony, was the mother of another bastard child, born on the tenth day of April of the year previous. It also appeared from her testimony that the defendant had connection with her but once, and it was thereby rendered certain, if the witness was to be believed, that he was not the father of the first child. While she was upon the stand, and some testimony had been given by her in relation to the first child, counsel for the defendant asked her this question: "Who was the father of that child?" To this question the state objected, and the court sustained the objection, and the defendant assigns the exclusion of the question as error. The objection made below to the question, and now urged, is that it did not appear to be material. A charge like the one in question, which may be falsely made for various motives, is oftentimes with great difficulty disproved. The defendant, to be sure, is allowed to testify in his own behalf; but standing charged, as he does, with a heinous offense, his testimony is oftentimes discredited, and considered as outweighed by the testimony of the complainant alone. But, where the complainant has been guilty of illicit intercourse with a man other than the defendant, it is competent to show such fact as a circumstance to be used in corroboration of the defendant, and this circumstance may become very important, if it is shown who the other man was, and that his intimacies and opportunities continued until after the child in question was begotten.

*[margin note: 1. BASTARDY: evidence of paternity of former bastard child.]*

In the case at bar, the evidence shows that at the time the child in question was begotten the complainant was living in the defendant's family, and was engaged to be married to a man who was also living in the family, and was one of the defendant's employes; and that he remained engaged to her, notwithstanding what transpired, and was engaged at the time of the trial. The name of this man was Gillian Vallier. Now, if, when the complainant was asked who was the father of the first child, born less than fourteen months prior to the birth of the second, she had answered that Gillian Vallier was, the proof thus afforded of his disposition, and of his conquest over the complainant's virtue, with the evidence of his continued engagement through the complainant's humiliating and disgraceful condition, would have gone far towards corroborating the defendant in the denial which he made in his testimony that the child in question was his. We may say, further, that, according to the testimony of one witness, the complainant stated that Vallier was the father of the child in question, but that Mr. Woodworth would have to pay for it all the same. If the testimony of this witness was to be believed, there can be scarcely a doubt that a verdict should have been rendered for the defendant. Proof that Vallier was the father of the first child would have tended to make credible the testimony of this witness, as well as corroborated the defendant in his denial.

It is true, when the question was asked as to who was the father of the first child, evidence had not then been introduced by the defendant tending to implicate Vallier as the father of the child in question; and, besides, it is not certain how the question would have been answered. But we can not say that it did not for that reason appear to be material. However it might have been answered, it might have led to an important inquiry. It was abundantly evident that the purpose of the question was to commence laying the foundation for the inference that the father of the first child, who it was proved was not the defendant, was the father of the

second.  The first step towards a successful inquiry was to ascertain the name of the father of the first child.  The fact sought was an obvious link in a chain of inquiry suggested by the very nature of the case itself.  We do not think it can be said that the defendant was not pursuing the proper order of evidence.  We cannot presume that the defendant knew how the complainant would answer the question.  He should, we think, have been allowed to have the answer, and then govern himself accordingly.  Besides, the defense proceeded upon the theory that the complainant had been guilty of perjury.  Somewhat depended upon not disclosing to her the exact purpose of the inquiry, or future plan of evidence, if one had been formed.  We think that the defendant was entitled to considerable freedom in this respect, and that the question should have been allowed.

II.  After the defendant had testified in his own behalf, the state, in order to impair his credibility, introduced witnesses

2. EVIDENCE: of bad moral character to impeach witness: rebutting. who testified that he was not a man of good moral character.  On cross-examination, however, it was revealed that the talk against the defendant's moral character was based upon the fact that he had kept house, and had employed as a domestic, through many years, one Mollie Rynders, and had, a part of the time, no other woman in the house.  The defendant introduced as a witness one Quinn, who testified that he lived in the defendant's family during the same time Mollie Rynders did.  He was then asked this question: " State whether there was anything in the conduct of either Mr. Woodworth or her to excite suspicion, or give occasion for rumors of bad conduct between them?"  The state objected to this question, and the objection was sustained.  The defendant assigns the ruling as error.

In our opinion, the question was properly excluded.  The state had not shown that there had been any bad conduct between the defendant and his domestic, nor could it have been allowed to do so.  The Code provides that " the general moral character of a witness may be proved for the pur-

pose of testing his credibility." Section 3649. Evidence
of particular immoral acts is not admissible. The rule is
stated in 1 Greenl. Ev. § 461, as follows: "In impeaching
the credit of a witness, the examination must be confined to
his general reputation, and not be permitted as to particular
facts; for every man is supposed to be capable of supporting
the one, but it is not likely that he should be prepared to
answer to the òther without notice." If such evidence had
been admissible, and had been introduced on the part of the
state, it would follow, of course, that the defendant should be
allowed to disprove the alleged immoral acts. But such is
not the case. The only suggestion of immoral conduct.
between the defendant and his domestic was drawn out by·
the defendant on cross-examination. His object was to limit;
and define the character of the bad reports against him, and·
break the force of the evidence. He showed by the cross-
examination that bad reports against him arose from a cir-
cumstance which, at worst, was equivocal in its character,
and not necessarily inconsistant with his innocence. Further
than that we do not think that he was entitled to go. If he
could have been allowed to show by cross-examination the·
foundation of the bad reports, and then, by evidence in chief;.
show that he was not guilty of what he had been suspected,.
the state should have come prepared to rebut the evidence in,
chief; and, under such a rule, any trial might take the form.
of an indefinite number of criminal accusations and defenses
of witnesses. It was the defendant's right by cross-examina-
tion to limit and define the character of the bad reports.
against him, and by evidence in chief, showing his general
moral character to be good, to directly rebut the state's evi-
dence. This he did do, and with this, we think, he should
have been content.

III. The state introduced as a witness one Michael Mans-
field, the father of the complainant. The defendant intro-
duced witnesses who testified that the general
moral character of Mansfield was bad. The state,

presumably to break the force of this evidence, undertook by cross-examination to limit the bad reports against Mansfield to his character as a liar and a thief. The court in its charge (fifth division) instructed the jury, in substance, that, if the whole testimony of any witness called to testify to the general moral character of Mansfield disclosed that his testimony was based upon a particular vice, or reputation for a particular vice or immorality, it would not be sufficient to show a want of general moral character. The giving of this instruction is assigned as error. While it is true that evidence of particular immoral acts cannot be given for the 'purpose of impeaching a witness' general moral character, yet, where the moral character has been impeached in the usual way, by showing his general reputation to be bad, we do not think the party offering him can by cross-examination wholly destroy the impeaching evidence, by showing that the witness' bad reputation is limited to some particular vice. A person cannot be said to have a good moral character who has a reputation for any vice. The word "general," as used in the section of the statute cited, was designed, we think, to indicate the mode of proof, and not as implying that a person's general moral character is good, which is bad only in one respect. The moral character of a witness is to be shown in a general way, and that is by his general reputation. If the state succeeded upon cross-examination in showing that the bad reputation of Mansfield was confined to his character as a liar and a thief, it was doubtless entitled to whatever mitigation of the impeaching evidence there might be in such fact, but, we think, to nothing more. In no view do we think that the instruction can be sustained; but it may not be improper for us to say that, even if it were correct in principle, it would not seem to be justified by the evidence. We are unable to discover that any witness called to testify against the moral character of Mansfield disclosed that his testimony was based upon a particular vice.

REVERSED.