THE STATE OF IOWA v. FRED HEIGHT, Appellant.

**Rape:** *When intercourse by prosecutrix with others is admissible.* Where, in a prosecution for statutory rape, the state introduced evidence to show that prosecutrix had contracted a venereal disease from defendant from the alleged connection, evidence that prosecutrix had sexual intercourse with others than defendant at about the time of the alleged rape was admissible to show that prosecutrix might have contracted the disease otherwise than from defendant, though immaterial as showing unchaste character.

Warrant of Arrest: AND RETURN OF OFFICER THEREON. Should not be admitted in evidence on the trial of a criminal charge, there being nothing connected with defendant's arrest bearing on the question of his guilt.

Impeachment. Where a witness testified that a defendant was free from venereal disease, it was error to admit his declarations as to the condition of the sheets on defendant's bed, the question asked of the witness not having covered the specific matter tending to show venereal disease, to which the declarations had reference.

Privileged Communication? COMPULSORY EXAMINATION BY DOCTOR. Where defendant, charged with rape, was examined while in jail by physicians not called by him, and against his consent, their testimony that they found him suffering from a venereal disease, which it was alleged prosecutrix contracted as a result of the connection, was not objectionable as relating to a privileged communication by a patient to his physician.

INVOLUNTARY CONFESSION: *Testimony of doctor is not.* Though communications by a person accused of rape to physicians were made under such circumstances as to constitute an involuntary confession, evidence by the physicians that in consequence of the communications they found defendant suffering from a certain venereal disease, which prosecutrix was alleged to have contracted from the intercourse, was not inadmissible because relating to an involuntary confession.

*Such examination is prohibited by constitution.* A compulsory physical examination of a person accused of rape, for the purpose of ascertaining if he is affected with a venereal disease alleged to have been communicated to prosecutrix, is in violation of Const. art. 1, section 9, providing that "no person shall be deprived of life, liberty or property without due process of law," and all evidence with reference to information secured by such examination is inadmissible.

*Appeal from Linn District Court.*—HON. WM. G. THOMP-
SON, Judge.

THURSDAY, OCTOBER 23, 1902.

PROSECUTION for the crime of rape. Verdict of guilty. From judgment thereon, defendant appeals.—*Reversed.*

*E. H. Crocker* for appellant.

*Chas. W. Mullan*, Attorney General, and *Chas. A. Van Vleck*, Assistant Attorney General, for the State.

McCLAIN, J.—The crime is charged to have been committed by having sexual intercourse with a female under the age of consent. The evidence tends to show that the prosecutrix, a child ten years of age, did not make complaint of the alleged outrage until about eleven days after its commission, and then, on examination by physicians, was found to be affected with venereal disease.. The prosecuting attorney claimed in his opening statement that he would be able to show that the defendant at the time of the alleged intercourse was afflicted with the same disease, which he might have communicated to prosecutrix at that time, and thereby produced in her the diseased condition which was found on such examination; and for the purpose of establishing this fact he called as witnesses certain physicians who had made an examination of defendant's private parts while he was confined in jail under arrest for the crime charged, and found that he then had, or had recently had, the disease in question. It is contended for appellant that this physical examination of him was made without his consent and against his protest, and, proper objections having been made to the introduction of the evidence, it is now argued, first, that the testimony of these physicians is with reference to a privileged communication. But it is enough to say in answer to this contention that the physicians were not consulted by defendant, and that no communications were made to them by the defendant in that capacity; nor did the defendant, even if·he submitted to the examination, do so with the idea that the physicians making it were acting as his physicians. The objection to the testimony that it disclosed a privileged communication was not well

taken. *People v Glover*, 71 Mich. 303 (38 N. W. Rep. 874). In any event, the privilege is not available to defeat the punishment of crime. *State v. Grimmell*, 116 Iowa, 596.

It is further argued that the testimony related to a confession by the defendant which was not voluntary, and that the evidence should have been excluded for this reason. There is ample ground in the record for saying that, if the testimony did relate to a confession, then the confession was not so far voluntary on the part of the defendant as to render it admissible. But defendant made no confession of guilt, nor admission that he was afflicted with the disease for which he was examined. And it has been well settled by decisions without conflict, from the earliest rulings on the subject to the present time, that, even though a confession be involuntarily made, inculpating facts discovered by means thereof may be established against the defendant. *Rex v. Warickshall*, 1 Leach, 263; *Rex v. Lockhart*, Id. 386; *Rex v. Griffin*, Russ. & Ry. 151; *Com. v. Knapp*, 9 Pick. 496 (20 Am. Dec. 491); *State v. Motley*, 7 Rich. Law, 327. There is nothing, therefore, in the rule excluding involuntary confessions to prevent the physicians who made the examination of defendant's person from testifying as to his condition with reference to having venereal disease.

But while the condition of defendant's privates was not, on the one hand, a confession or an admission, nor, on the other hand, an independent circumstance discovered by means of a confession or admission, it is nevertheless necessary to inquire further as to the admissibility of the evidence thereof, in view of the fact that it appears without reasonable doubt from the evidence that defendant was compelled to submit to such examination, and was therefore compelled to furnish evidence against himself. The examination by physicians was made under the direction of the prosecuting attorney, and was at first resisted by defendant, who finally consented thereto, if at

all, only after he had been told by one of the officers who
made the arrest, and who was present, acting under the
direction of the county attorney, and in his presence, that
the state had the right to require such an examination to
be made, and that the defendant must submit to it.    The
showing is amply sufficient to indicate legal duress, and we
must therefore inquire whether the evidence against de-
fendant secured by such duress, and which could not have
been secured otherwise, was admissible over defendant's
objection.

In many of the states are found constitutional provis-
ions similar to those of the fifth amendment to the federal
constitution, which, of course, has no application to pro-
ceedings in state courts (*Spies v. Illinois*, 123 U. S. 131
(8 Sup. Ct. Rep. 21, 31 L. Ed. 80); *Presser v. Illinois*, 116
U. S. 252 (6 Sup. Ct. Rep. 580, 29 L. Ed. 615); *Twitchell v.
Com.*, 7 Wall. 321 (19 L. Ed. 223), to the effect that the de-
fendant in a criminal prosecution shall not be compelled to
be a witness against himself; and it is argued by counsel for
prosecution that, even if such provision would render the
evidence in question incompetent in such states, the ab-
sence of a like provision from our constitution renders
such an objection unavailing in our courts, for Code, sec-
tion 5484, which seems to contain the only statutory lan-
guage on the subject, simply provides that "defendants in
all criminal proceedings shall be competent witnesses in
their own behalf but cannot be called as witnesses by the
state."    Perhaps this language is not broad enough to
cover the general ground of the usual constitutional guar-
anty, but we cannot concede that there is in the constitu-
tion of our state no guaranty against inquisitorial proceed-
ings for the purpose of compelling a defendant to disclose
criminating evidence.    Our constitution does explicitly
provide (article 1, section 9) that "no person shall be de-
prived of life, liberty or property without due process of
law," and the term "due process of law" has received by

this court, as well as by all the courts of this country, a very broad and liberal interpretation. In *Foule v. Mann*, 53 Iowa, 42, it is said (quoting from *Westervelt v. Gregg*, 12 N. Y. 209 (62 Am. Dec. 160) that it "undoubtedly means in the due course of legal proceedings, according to those rules and forms which have been established for the protection of private rights," and (quoting from *Bank v. Okely*, 4 Wheat. 235 (4 L. Ed. 559) that it was intended thereby "to secure the individual from the arbitrary exercise of the powers of government unrestrained by the established principles of private rights and distributive justice."

In *Trustees of Griswold College v. City of Davenport*, 65 Iowa, 633, we said: "The rule in respect to due process of law, stated in a general way, is said to be this: That everyone is entitled to the protection of 'those fundamental principles of liberty and justice which lie at the basis of all our civil and political institutions.' " But further citation of authorities is not necessary to establish the general proposition that fundamental principles of judicial procedure, whether in civil or criminal cases, as they existed and were recognized in the courts of England and the American colonies prior to the adoption of the federal and state constitutions, are intended to be preserved by this guaranty of due process of law, and that, while forms may be changed, essential guaranties cannot be taken away even by attempted legislative enactment. For instance, the rule of evidence that involuntary confessions cannot be shown as against the defendant in a criminal prosecution is not only not expressly recognized anywhere in our constitution, but it is not even embodied in the statutory provisions with reference to evidence; and yet can any one suppose that an act of the legislature abrogating this rule, and allowing confessions of a defendant, extorted by promises or threats, to be shown in a criminal proceeding, would be upheld? A complete answer to any such legislation would be that it deprived the accused of one of the

protections afforded him from time immemorial by rules
of evidence so fully recognized and so fundamental with
reference to criminal procedure that it must be contrary
to due process of law in criminal cases.    In the federal
courts, and in the courts of those states whose constitu-
tions contain guaranties against compelling one accused of
crime to be a witness against himself, it is well settled that
in neither criminal nor civil cases can a witness be required
to give self-criminating evidence.    *Emery's Case*, 107
Mass. 172 (9 Am. Rep. 22); *Counselman v. Hitchcock*, 142
U. S. 547 (12 Sup. Ct. Rep. 195, 35 L. Ed. 1110); *State v.
Simmons Hardware Co.*, 109 Mo. 118 (18 S. W. Rep. 1125,
15 L. R. A. 676).    It is true that in most of the cases in
which the maxim, "*Nemo tenetur seipsum accusare*," has
been considered with reference to its effect as applied to
statutory provisions tending to deprive the witness of the
benefit thereof, the constitutional provisions against com-
pelling the defendant in a criminal proceeding to testify
against himself have been referred to; but, in determin-
ing whether such an express constitutional guaranty is
essential to the preservation of the principle as a funda-
mental rule of criminal procedure, it is pertinent to suggest,
first, that, no matter how restricted the constitutional
guaranty, it has been given the same broad and liberal
interpretation.    Thus it is held that although the language
of the constitutional provision may simply be that no per-
son shall be required to testify against himself in a crim-
inal case, yet this guaranty amounts to a prohibition
against requiring a witness in a civil case to disclose facts
tending to show him guilty of a crime.    *State v. Simmons
Hardware Co.*, 109 Mo. 118 (18 S. W. Rep. 1125, 15 L. R.
A. 676).    Such guaranty is applicable to a witness before
any tribunal and in any proceeding.    *State v. Young*, 119
Mo. 495 (24 S. W. Rep. 1038).    And statutes which require
witnesses in certain penal actions to testify, regardless of
whether their evidence will tend to criminate them, guar-

anteeing them at the same time against their testimony
being used to convict for a crime thus disclosed, are un-
constitutional, notwithstanding the guaranty. See *Coun-
selman v. Hitchcock*, 142 U. S. 547, 565 (12 Sup. Ct. Rep.
195, 35 L. Ed. 1110), and many cases there cited and re-
viewed. The rule against requiring a witness to give self-
criminating evidence in any judicial proceeding is much
older than our constitution. It is one of the fundamentals
of the common law. The rule itself and the reasons for
it are thus stated by an eminent authority: "Upon a prin-
ciple of humanity, as well as of policy, every witness is
protected from answering questions by doing which he
would criminate himself,—of policy, because it would place
the witness under the strongest temptation to commit the
crime of perjury; and of humanity, because it would be
to extort a confession of the truth by a kind of duress,
every species and degree of which the law abhors. It is
pleasing to contrast the humanity-and delicacy of the law
of England in this respect with the cruel provisions of the
Roman law, which allowed criminals, and even witnesses
in some instances, to be put to the torture for the purpose
of extorting a confession." 1 Starkie, Evidence, 41. And
see 1 Roscoe, Criminal Evidence, 150; Broom, Legal Max-
ims, 968. In *People v. Forbes*, 143 N. Y. 219, 227 (38 N. E.
Rep. 303, 305), this language is used: "These constitu-
tional and statutory provisions (referring to the constitu-
tion and statutes of New York on this subject) have long
been regarded as safeguards of civil liberty quite as great
and important as the privileges of the writ of habeas cor-
pus, or any of the other fundamental guaranties for the
protection of personal rights. When a proper case arises,
they should be applied in a broad and liberal spirit, in
order to secure to the citizen that immunity from every
species of self-accusatio implied in the brief and compre-
hensive language in which they are expressed. The security

which they afford to all citizens against the zeal of the public prosecutor and public clamor for the punishment of crime should not be impaired by any narrow or technical views." The origin of the doctrine embodied in the maxim, *"Nemo tenetur seipsum accusare,"* seems to be obscure. Perhaps it originated in a protest against the inquisitorial procedure of the ecclesiastical courts, and was introduced by statute. See article by Professor Wigmore in 5 Harvard Law Review, 71. But at any rate it became a general principle of the common-law system of jurisprudence before the settlement of this country, and was regarded as a guaranty against inquisitorial proceedings. In *Brown v. Walker*, 161 U. S. 591, 596 (16 Sup. Ct. Rep. 644, 646, 40 L. Ed. 819), this language is used with reference to it: "The maxim *'Nemo tenetur seipsum accusare,'* had its origin in a protest against the inquisitorial and manifestly unjust methods of interrogating accused persons, which has long obtained in the continental system, and until the expulsion of the Stuarts from the British throne, in 1688, and the erection of additional barriers for the protection of the people against the exercise of arbitrary power, was not uncommon even in England. While the admissions or confessions of the prisoner, when voluntarily and freely made, have always ranked high in the scale of incriminating evidence, if an accused person be asked to explain his apparant connection with a crime under investigation, the ease with which the questions put to him may assume an inquisitorial character, the temptation to press the witness unduly, to browbeat him if he be timid or reluctant, to push him into a corner, and to entrap him into fatal contradictions, which is so painfully evident in many of the earlier state trials, notably in those of Sir Nicholas Throckmorton and Udal, the Puritan minister, made the system so odious as to give rise to a demand for its total abolition. The change in the English criminal procedure in that particular seems to be founded upon no statute

and no judicial opinion, but upon a general and silent acquiescence of the courts in a popular demand. But however adopted, it has become firmly embedded in English as well as in American jurisprudence. So deeply did the iniquities of the ancient system impress themselves upon the minds of the American colonists, that the states, with one accord, made a denial of the right to question an accused person a part of their fundamental law, so that a maxim which in England was a mere rule of evidence became clothed in this country with the impregnability of a constitutional enactment." And in *Bram v. U. S.*, 168 U. S. 533, 545, (18 Sup. Ct. Rep. 183, 187, 42 L. Ed. 568), after quoting this language, the court continues: "There can be no doubt that long prior to our independence the doctrine that one accused of crime could not be compelled to testify against himself had reached its full development in the common law, was there considered as resting on the law of nature, and was embedded in that system as one of its great and distinguishing attributes." And in *Counselman v. Hitchcock*, 142 U. S. 547, 563, (12 Sup. Ct. Rep. 195, 198, 35 L. Ed. 1110), the court says: "It is an ancient principle of the law of evidence that a witness shall not be compelled in any proceeding to make disclosures or to give testimony which will tend to criminate him, or subject him to fines, penalties, or forfeitures."

Notwithstanding the fact already suggested that the cases heretofore cited refer to a form of constitutional provision not found in our own bill of rights, we are convinced that the principle itself is too fundamental to have been purposely omitted from the charter of liberties of the people of Iowa, and that, had there been no such specific provison anywhere, the same result would have been reached under the general guaranty of due process of law. If such a guaranty is not thus to be implied, then we have in this state the anomalous situation that by legislative provision the inquisitorial proceedings, so generally.

referred to as reprehensible, and the absence of which is so constantly mentioned as one of the excellencies of the common law, might be introduced. There would be nothing unconstitutional, under such a construction, in a statute which should restore torture by the thumbscrew or the boot as a legitimate means of securing evidence in a criminal prosecution. A constitutional guaranty against self-criminating evidence does not make it unlawful to require defendant to uncover his face or hands, or take his feet from under a chair, in the courtroom, for purpos·s of identification. *State v. Prudhomme*, 25 La. Ann. 523; *Johnson v. Com.*, 115 Pa. St. 369, 395, (9 Atl. Rep. 78); *State v. Garrett*, 71 N. C. 85, (17 Am. Rep. 1); *Myers v. State*, 97 Ga. 76, 99, (25 S. E. Rep. 252). Some courts have gone to the extent of receiving evidence obtained by compelling defendant to "make tracks." *State v. Graham*, 75 N. C. 256; *Walker v. State*, 7 Tex. App. 265, (32 Am. Rep. 595). Other courts have held such evidence inadmissible.. *Stokes v. State*, 5 Baxt. 619, (30 Am. Rep. 72); *Day v. State* 63 Ga. 667; *Blackwell v. State*, 67 Ga. 76, (44 Am. Rep. 717); *People v. Meade*, 50 Mich. 228, (15 N. W. Rep. 95). And see *Jordan v. State*, 32 Miss. 382. This court has gone no further than to sustain the right to require defendant to stand up in court for the purpose of identification. *State v. Reasby*, 100 Iowa, 231. The only case sustaining the right to require disclosure of those parts of the person not usually exposed is that of *State v. Ah Chuey*, 14 Nev. 79, (33 Am. Rep. 530), where it was held not improper to require the exposure of the forearm to discover tattoo marks for identification, and even in this case it is said that accused should never be compelled to make any indecent or offensive exhibition of his person for any purpose whatever. In *People v. McCoy*, 45 How. Prac. 216, it was held improper to receive evidence that a female defendant charged with the murder of a bastard child had, on a forcible examination of her person without her consent, been

found to have been recently delivered of a child.  *Black-well v. State*, 67 Ga. 76, (44 Am. Rep. 717), is also in point, to the effect that evidence derived from compulsory examination of the person is not admissible.  The case of *People v. Glover*, 71 Mich. 303 (38 N. W. Rep. 874) relied on by the state, is not in point on this question, as defendant consented to the examination of his person, and voluntarily testified with reference to the subject.  In *State v. Nordstrom*, 7 Wash. 506 (35 Pac. Rep. 382), it is held that an accused person "cannot be compelled to exhibit those portions of his body which are usually covered, for the purpose of securing identification, or in other ways affording evidence against him." It would seem, therefore, that such an investigation as that made in the case before us is without authority as against defendant's objection, and the receipt of the evidence was error, on the ground that it was the result of the invasion of defendant's constitutional right, impliedly guaranteed under the provision of our constitution as to due proce s of law, not to criminate himself.

We have, however, in our state constitution an express guaranty against any proceeding under the guise of law such as that resorted to by the officers in this case for the purpose of securing criminating evidence from the person of the defendant.  It is provided by article 1, section 8, that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable seizures and searches, shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and persons and things to be seized."  This guaranty, which is in substantially the same terms found in the constitution of the United States ( article 4 of amendments) and in the constitutions of many, if not all, of the other states, has also received a broad and liberal interpretation for the purpose of preserving the spirit of constitutional liberty.  In *Boyd v. U. S.*, 116 U. S. 616, 622 (6

Sup. Ct. Rep. 524, 228, 29 L. Ed. 746), the court, in construing this provision of the federal constitution, uses this language: "It is our opinion, therefore, that a compulsory production of a man's private papers to establish a criminal charge against him or to forfeit his property is within the scope of the fourth amendment to the constitution in all cases in which a search and seizure would be, because it is a material ingredient, and effects the sole object and purpose, of search and seizure. The principal question, however, remains to be considered: Is a search and seizure, or, what is equivalent thereto, a compulsory production, of a man's private papers, to be used in evidence against him in a proceeding to forfeit his property for alleged fraud against the revenue laws — is such a proceeding for such a purpose an 'unreasonable search and seizure,' within the meaning of the fourth amendment of the constitution? or, is it a legitimate proceeding? It is contended by the counsel for the government that it is a legitimate proceeding, sanctioned by long usage and the authority of judicial decision." And the court continues on page 624, (6 Sup. Ct. Rep. 529, 29 L. Ed. 746): "In order to ascertain the nature of the proceedings intended by the fourth amendment to the constitution, under the terms 'unreasonable searches and seizures,' it is only necessary to recall the contemporary or then recent history of the controversies on the subject both in this country and in England. The pract ce had obtained in the colonies of issuing writs of assistance to the revenue officers, empowering them, in their discretion, to search suspected places for smuggled goods, which James Otis pronounced 'the worst instrument of arbitrary power, the most destructive of English liberty and the fundamental principles of law, that ever was found in an English lawbook,' since they placed 'the liberty of every man in the hands of every petty officer.' This was in February, 1761, in Boston, and the famous debate in which it occurred was perhaps the

most prominent event which inaugurated the resistance of the colonies to the oppressions of the mother country. 'Then and there,' said John Adams, 'then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born.'" And that this guaranty applies to the person of the defendant, as well as to his papers, is made evident by the language of Lord Camden in *Entick. v. Carrington*, 19 How. St. Tr. 1030, quoted at length in *Boyd v. U. S. supra*; a portion of the quotation being as follows (page 629): "Lastly, it is urged as an argument of utility that such a search is a means of detecting offenders by discovering evidence. I wish some cases had been shown where the law forceth evidence out of the owner's custody by process. There is no process against papers in civil causes. It has been often tried, but never prevailed. Nay, where the adversary has by force or fraud got possession of your own proper evidence, there is no way to get it back but by action. In the criminal law such a proceeding was never heard of; and yet there are some crimes— such, for instance, as murder, rape, robbery, and housebreaking, to say nothing of forgery and perjury—that are more atrocious than libeling. But our law has provided no paper search in these cases to help forward the conviction. Whether this proceedeth from the gentleness of the law toward criminals, or from a consideration that such a power would be more pernicious to the innocent than useful to the public, I will not say. It is very certain that the law obligeth no man to accuse himself, because the necessary means of compelling self-accusation, falling upon the innocent, as well as the guilty, would be both cruel and unjust; and it would seem that search for evidence is disallowed upon the same principle. Then, too, the innocent would be confounded with the guilty." And the court, after this quotation, continues as follows (page 630;

6 Sup. Ct. 532, 29 L. Ed. 746): "The principles laid down in this opinion affect the very essence of constitutional liberty and security. They reach farther than the concrete form of the case then before the court, with its adventitious circumstances. They apply to all invasions on the part of the government and its employes of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors or the rummaging of his drawers that constitutes the essence of the offence; but it is the invasion of his indefeasible right of personal security, personal liberty, and private property, where that right has never been forfeited by his conviction of some public offence; it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment. Breaking into a house and opening boxes and drawers are circumstances of aggravation, but any forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of crime or to forfeit his goods is within the condemnation of that judgment. In this regard the fourth and fifth amendments run almost into each other." That there can be no doubt as to the continued acquiescence of the supreme court of the United States in these general expressions of view, whatever question may have been raised as to the application of them in the *Boyd Case*, is apparent from the fact that they are quoted with approval in the dissenting opinion in *Brown v. Walker*, 161 U. S. 591, 615 (16 Sup. Ct. Rep. 644, 40 L. Ed. 819), and are at the basis of, though not expressly relied upon in, the majority opinion. And see, in general, with reference to a similar provision in a state constitution, *Newberry v. Carpenter*, 107 Mich. 567 (65 N. W. Rep. 530, 31 L. R. A. 163, 61 Am. St. Rep. 346). There are, of course, limitations as to immunity from search and seizure for the purpose of securing evidence of crime. It is well settled that, when one charged with an offense is arrested, the officers may, without fur-

ther legal procedure, seize weapons with which the crime has been committed, property which has been obtained by means of the criminal act, or articles which may give a clew to the commission of the crime or identification of the criminal. *Chastang v. State*, 83 Ala. 29 (3 South. Rep. 304); *Commercial Exch. Bank v. McLeod*, 65 Iowa, 665; *Reifsnyder v. Lee*, 44 Iowa, 101. · And the officer making such search may testify as to any facts, even though criminating, which were discovered thereby. *Starchman v. State*, 62 Ark. 538 (36 S. W. Rep. 940); *Shields v. State*, 104 Ala. 35 (16 South. Rep. 85, 53 Am. St. Rep. 17); *State v. Flynn*, 36 N. H. 64. But "a party to a suit can gain nothing by virtue of violence under the pretense of process, nor will a fraudulent or unlawful use of process be sanctioned by the courts. In such cases parties will be restored to the rights and position they possessed and occupied before they were deprived thereof by the fraud, violence, or abuse of legal process." *Reifsnyder v. Lee*, 44 Iowa, 101. As to the general constitutional immunity from unlawful searches and seizures, see, also, Cooley, Constitutional Law (6th Ed.) 364, 370, 371n. None of the exceptions recognized cover such a case as we have before us. The search was for the mere purpose of securing evidence by an invasion of the private person of the defendant, and we think there is no consideration whatever which will justify it. Without further elaboration or the multiplication of authorities, it is enough to say that the officers acted unlawfully in compelling defendant to submit to this examination, and all evidence with reference to information secured thereby should have been excluded on defendant's objection.

After the evidence already referred to had been admitted, tending to show that defendant was afflicted with a venereal disease which he might have communicated to prosecutrix by the alleged rape, it was proposed to show in behalf of the defendant that prosecutrix had at about

the time of the commission of the alleged crime had sexual intercourse with others than the defendant, by whom the disease with which she was found to be afflicted might have been communicated to her. This evidence was, as we think, wrongfully excluded. No doubt, it is true that, as consent is immaterial in such a prosecution, the female being under the age of consent, evidence of unchaste character or acts of intercourse with other men is immaterial; but, where it is sought to show that the venereal disease was contracted by intercourse with defendant, it is open to the defendant to show that it might have been contracted otherwise. *Nugent .v. State*, 18 Ala. 521. And see, as analogous in part, *State v. Woodworth*, 65 Iowa, 141. If on a retrial there is competent evidence that defendant had venereal disease at the time of the connection with prosecutrix, should any be shown, evidence of her having had sexual connection with others near the same time should be admitted.

The mother of defendant, with whom he lived, having testified that he had no venereal disease, the state sought to impeach her evidence by showing declarations made by her as to the condition of the sheets of defendant's bed. This evidence, received over defendant's objection, was improperly admitted, for the reason that proper foundation therefor had not been laid; the question asked of the witness not having covered the specific matter tending to show venereal disease, to which the conversation sought to be subsequently established had reference.

The state offered in evidence the warrant of arrest of defendant, and the return of the officer thereon. This evidence was erroneously received. We can hardly imagine any case in which the warrant and return would be competent evidence. There was nothing connected with defendant's arrest, so far as appeared from the return, which had any bearing on the question of his guilt.

We find the assignments of error on the instructions not to be well taken. Some complaint is made as to the impaneling of the jury, but as a similar error, if there was error in this respect, is not likely to occur on another trial, the assignment with reference to the matter need not be considered.

While it is with reluctance that we reverse a criminal case where the evidence is sufficient to go to the jury on the question of guilt, yet the fundamental rules of procedure adopted for the protection of the innocent must be applied not only in cases were it appears that an innocent man has been convicted, but in all cases, regard ess of our views as to defendant's guilt. We are compelled to say in this case that, in view of the errors committed, a new trial must be granted.—REVERSED.