APPEL, Justice
(dissenting).
I respectfully dissent.
I begin with a survey of what I regard as cardinal first principles of search and seizure law under article I, section 8. Second, I examine the degree to which the majority opinion conforms to those principles. Third, I suggest alternative approaches to the problems presented in this case. Finally, I emphasize the importance of narrowly interpreting the significance of this case.
I. Principles of Search and Seizure Law.
A. Overview of the Warrant Requirement. I begin with a brief review of the language of our search and seizure provision in article I, section 8, which states:
The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.
Iowa Const, art. I, § 8.
The warrant clause of article I, section 8 has a number of substantive constitutional requirements. First, there must be probable cause for a search. Id. Second, the warrant must describe with particularity the place to be searched. Id. Third, the warrant must describe with particularity the persons and things to be seized. Id.
Each of these substantive requirements has independent constitutional importance. The gateway requirement of probable cause of course serves to limit government discretion and avoid general searches. The particularity requirements, however, are also constitutionally essential. They are proportionality requirements. Even when gateway probable cause is present, the proportionality requirements of article I, section 8 serve to ensure that when a search is warranted, the search is limited *128 in scope by the nature of the underlying problem. For instance, with respect to place, a warrant with ample probable cause to search a “silver in color passenger train car” for evidence of gambling infractions does not authorize the search of a nearby “red caboose.” Long v. State, 132 S.W.3d 443, 444-45, 447, 451 (Tex.Crim. App.2004) (internal quotation marks omitted). As to items, a warrant to search for drugs does not authorize the officer to seize checks, a social security card, or other items of identification. People v. Pitts, 13 P.3d 1218, 1220, 1223-24 (Colo.2000) (en banc).
The genius of the gateway and proportionality requirements is that the government must satisfy these requirements before a neutral and detached magistrate. See State v. Short, 851 N.W.2d 474; 502 (Iowa 2014). This eliminates the risk of ex post facto explanations that conform to the nature of the evidence ultimately found and ensures the decision regarding compliance with constitutional norms is made before a person not “engaged in the often competitive enterprise of ferreting out crime.” Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436, 440 (1948). As was noted by Judge Huf-stedler some time ago, “The requirement that [a probation] officer articulate his reasons for making a search before he searches is a substantial deterrent to impulsive and arbitrary official conduct and a real safeguard against after-the-fact justifications.” Latta v. Fitzharris, 521 F.2d 246, 257 (9th Cir.1975) (Hufstedler, J., dissenting). The risk of ex post facto explanations is very real. It is, of course, a fundamental principle of search and seizure law that the validity of the search is not affected by what it turns up. As we stated long ago, “No amount of incriminating evidence, whatever its source, will supply the place of [a] warrant.” McClurg v. Brenton, 123 Iowa 368, 372, 98 N.W. 881, 882 (1904); see also United States v. Di Re, 332 U.S. 581, 595, 68 S.Ct. 222, 228-29, 92 L.Ed. 210, 220-21 (1948). Yet, when incriminating evidence is found, there is a temptation to manipulate the facts or distort search and seizure law in order to uphold the search and sustain the resulting criminal conviction. That is why in Johnson, the United States Supreme Court held a warrantless search was invalid even though there was likely ample probable cause to support the search. 333 U.S. at 13-15, 68 S.Ct. at 368-69, 92 L.Ed. at 440-41. As Justice Frankfurter noted, “[T]he safeguards of liberty have frequently been forged in controversies involving not very nice people.” United States v. Rabinowitz, 339 U.S. 56, 69, 70 S.Ct. 430, 436, 94 L.Ed. 653, 662 (1950) (Frankfurter, J., dissenting), overruled on other grounds by Chimel v. California, 395 U.S. 752, 768, 89 S.Ct. 2034, 2042-43, 23 L.Ed.2d 685, 696-97 (1969). “ ‘[T]he procedure of antecedent justification ... is central to the Fourth Amendment.’ ” Katz v. United States, 389 U.S. 347, 359, 88 S.Ct. 507, 515, 19 L.Ed.2d 576, 586 (1967) (quoting Osborn v. United States, 385 U.S. 323, 330, 87 S.Ct. 429, 433, 17 L.Ed.2d 394, 400 (1966)).
As a result, whenever the warrant requirement is found to be inapplicable, many important restrictions on governmental power are lost. Not only is the gateway requirement of probable cause at risk, so too is the proportionality requirement. Further, the requirement that the government explain the basis for the search before it occurs in order to avoid post hoc explanations is totally lost. That is why in Short, we reinvigorated what is sometimes called the “warrant preference” approach to search and seizure law under article I, section 8. 851 N.W.2d at 497; see generally James J. Tomkovicz, Divining and Designing the Future of the Search Incident to Arrest Doctrine: Avoiding In *129 stability, Irrationality, and Infidelity, 2007 U. Ill. L. Rev. 1417 (2007) (advocating the warrant preference approach as the best interpretation of search and seizure law).
B. Constitutional Provisions Related to Search and Seizure Limit Arbitrary Exercise of Government Power. Historically, the Crown’s claimed authority to engage in sweeping searches for violations of British mercantile policies toward the colonies was a central cause of the American Revolution. See State v. Ochoa, 792 N.W.2d 260, 271 (Iowa 2010). The focus of the famous Paxton’s Case was the legality of writs of assistance, “which gave customs officers open-ended authority to search homes for evidence of customs violations.” Id. (citing Tracey Maclin, The Complexity of the Fowrth Amendment: A Historical Review, 77 B.U. L. Rev. 925, 946 (1997)). When James Otis delivered his famous defense in Paxton’s Case, calling for specific warrants and characterizing “ ‘the freedom of one’s house’ ” as among “ ‘the most essential branches of English liberty,’ ” id. (quoting William J. Cuddihy, The Fourth Amendment: Origins and Original Meaning, 602-1791, at 377-78 (2009) [hereinafter Cuddihy]), the rhetoric moved a young lawyer attending the court session, John Adams, to later declare, “ ‘[t]hen and there the Child Independence was born,’ ” id. at 272 (quoting Jacob W. Landynski, Search and Seizure and the Supreme Court: A Study in Constitutional Interpretation 37 (1966) [hereinafter Landynski]). What is clear from the history is that constitutional provisions related to search and seizure were designed to be a limitation on government power. Neither article I, section 8 nor the Fourth Amendment is an enabling act extending the reach of government.
The focus of search and seizure law is eliminating arbitrary exercise of government power whenever it might be used. While the text of article I, section 8, like the Fourth Amendment, is challenging, it is clear that the search and seizure strictures are not limited to criminal matters. Other constitutional concepts, like the federal right against self-incrimination, contain express limitations to criminal proceedings. See U.S. Const, amend. V. No such limitation is contained in article I, section 8. Article I, section 8 is not a constitutional chameleon that changes col- or when the government invader presents a civil identification card rather than a badge of law enforcement. The underly-. ing motivation of the government official is not and cannot be the determining factor. As Justice Brandéis taught us years ago, “The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding.” Olmstead v. United States, 277 U.S. 438, 479, 48 S.Ct. 564, 573, 72 L.Ed. 944, 957 (1928) (Brandeis, J., dissenting); overruled on other grounds by Katz, 389 U.S. at 353, 88 S.Ct. at 512, 19 L.Ed.2d at 583.
In any event, parole officers, like probation officers, have at least two functions. Parole officers may serve the state interest by assisting the parolee to complete parole successfully and be reintegrated into the community. They also serve another purpose, however: ensuring that persons convicted of crimes, who are more likely to engage in criminal activity than members of the public generally, do not commit additional crimes. See United States v. Knights, 534 U.S. 112, 120-21, 122 S.Ct. 587, 592, 151 L.Ed.2d 497, 506 (2001) (recognizing dual concern of the state in context of probationer’s residence search). These two purposes of parole officers recognized in Knights are conjoined twins and cannot easily be surgically separated. Ordinarily, in search and seizure jurisprudence, we do not inquire into the subjective motivation of government officials. *130 See State v. Simmons, 714 N.W.2d 264, 274 (Iowa 2006). That said, a home visit more likely reflects the function of assisting in a parolee’s rehabilitation, while a specific search in private areas of a residence is more likely to be pursuant to the parole officer’s law enforcement function.
C. The Freestanding Reasonableness Clause as Ahistorical and Antithetical to the Constitutional Values of the Warrant Clause. We discussed the relationship between the reasonableness clause and the warrant clause in Short, 851 N.W.2d at 501-02. It simply cannot be that the reasonableness clause is a freestanding provision that trumps the warrant clause. Id. Otherwise, the warrant clause would be superfluous. See Rabinowitz, 339 U.S. at 70, 70 S.Ct. at 436, 94 L.Ed. at 662 (“One cannot wrench ‘unreasonable searches’ from the text and context and historic content of the Fourth Amendment.”). Indeed, the meaning of reasonableness, certainly at the time of the adoption of the Fourth Amendment to the United States Constitution, from which article I, section 8 was derived, was likely used in the Blackstonian sense and was a stand in for “lawful.” See Short, 851 N.W.2d at 501.
Those that emphasize reasonableness over the warrant requirement often use a balancing test to determine the applicability of the warrant requirement to broad categories of persons. The categorical reasonableness test allowing courts to make pragmatic assessments of the need for government action balanced against the interests of citizens in determining the applicability of search and seizure requirements is not explicitly mentioned in the text of article I, section 8 or in the Fourth Amendment. The categorical reasonableness test was not invented until relatively recently. See T. Alexander Aleinikoff, Constitutional Law in the Age of Balancing, 96 Yale L.J. 943, 948 (1987) [hereinafter Aleinikoff] (noting balancing, as a “method of constitutional interpretation, ... first appears in majority opinions in the late 1930’s and early 1940’s”). As noted by a leading scholar, reasonableness that engages in relativistic balancing efforts reflects recent, “ideologically-driven judicial choices, not a rendition of the original understanding.” Thomas Y. Davies, Correcting Search-And-Seizure History: Now-Forgotten Common-Law Warrantless Arrest Standards and the Original Understanding of “Due Process of Law,” 77 Miss. L.J. 1, 224 (2007); see also Aleini-koff, 96 Yale L.J. at 948-49.
Categorical balancing tests present a troublesome methodology. A constitutional vision of search and seizure employing categorical balancing fails to zealously protect the rights of citizens because it is not based on transparent and preestablished constitutional norms. Untethered to such norms, categorical balancing is based on a quasi-legislative process in which the court makes pragmatic policy determinations that paternalistically relieve classes of government activity from the central restrictions on government power contained in the warrant requirement of article I, section 8.
Further, categorical or not, balancing tests based upon reasonableness run the risk of being no test at all. An amorphous doctrine based on reasonableness threatens to engulf search and seizure law. See New Jersey v. T.L.O., 469 U.S. 325, 369-70, 105 S.Ct. 733, 757-58, 83 L.Ed.2d 720, 752-53 (1985) (Brennan, J., concurring in part and dissenting in part); Rabinowitz, 339 U.S. at 83, 70 S.Ct. at 443, 94 L.Ed. at 669 (“It is no criterion of reason to say that the district court must find [a search] reasonable.”); see also Skinner v. Ry. Labor Execs.’ Ass’n, 489 U.S. 602, 637, 109 S.Ct. 1402, 1424, 103 L.Ed.2d 639, 673 *131 (1989) (Marshall, J., dissenting) (noting that absent warrant and probable cause standards, the concept of reasonableness is “virtually devoid of meaning, subject to whatever content shifting judicial majorities, concerned about the problems of the day, choose to give to that supple term”); Anthony G. Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349, 393 (1974) (stating reliance on reasonableness threatens to turn search and seizure law into “one immense Rorschach blot”). See generally Short, 851 N.W.2d at 501-02 (criticizing freestanding reasonableness-clause theory).
D. Security of the Home as Central to Search and Seizure Protection. Oh, the words of Pitt the Elder!
“The poorest man may, in his cottage, bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England may not enter; all his force dares not cross the threshold of the ruined tenement.”
Ochoa, 792 N.W.2d at 270 (quoting Nelson B. Lasson, The History and Development of the Fourth Amendment to the United States Constitution 49-50 (1937)); see also Short, 851 N.W.2d at 495-96.
The concept of the home as one’s castle was a central part of English law that the colonists brought to the new world. See Short, 851 N.W.2d at 501. In his oration in Paxton’s Case, Otis pronounced that “ ‘the freedom of one’s house’ was among ‘the most essential branches of English liberty.’ ” Id. (quoting Cuddihy at 377-78). John Adams remembered that Otis argued that the writ of assistance in the case was “ ‘against the fundamental principles of law, the privilege of house.’ ” Ochoa, 792 N.W.2d at 271 (quoting Landynski at 34).
The concept of a home as one’s castle came to Iowa, too. Iowa Governor Robert Lucas stated at the first Iowa constitutional convention that he deemed the most important right was “ ‘to secure to the poor man a little spot of ground where he could build him a cottage and have a home for himself and family, free from the fear of being turned out of doors.’ ” Id. at 275 (quoting Fragments of the Debates of the Iowa Constitutional Conventions of 1811 and 1816, at 159-61 (1900)). In McClurg, we declared, “At the closed door of the home, be it palace or hovel, even bloodhounds must wait till the law, by authoritative process, bids it open.” 123 Iowa at 372, 98 N.W. at 882.
There is something about a home that generates poetic language in the context of searches and seizures. The notion of “home sweet home” may seem trite to some, but it is universal in our legal culture. It is no surprise that protection of the home against government intrusion has been declared one of the prime purposes of search and seizure law. In the first substantive search and seizure case, Boyd v. United States, the Supreme Court broadly noted that the purpose of the Fourth Amendment is to protect against invasions of “the sanctity of a man’s home and the privacies of life” from “government and its employes.” 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746, 751 (1886), abrogated on other grounds by Warden v. Hayden, 387 U.S. 294, 302, 87 S.Ct. 1642, 1647-48, 18 L.Ed.2d 782, 789 (1967). As stated more recently in United States v. United States District Court, “physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.” 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752, 764 (1972); see also Kyllo v. United States, 533 U.S. 27, 37-38, 121 S.Ct. 2038, 2045, 150 L.Ed.2d 94, 104 (2001); Welsh v. Wisconsin, 466 U.S. 740, 750, 104 S.Ct. 2091, 2098, 80 L.Ed.2d 732, 743 (1984); *132 Payton v. New York, 445 U.S. 573, 589-90, 100 S.Ct. 1371, 1381-82, 63 L.Ed.2d 639, 653 (1980); Ochoa, 792 N.W.2d at 277.
E. The Role of Expectation of Privacy in Determining Applicability of the Warrant Requirement. In Katz, Justice Harlan surprised everyone, perhaps even himself, when he penned a concurring opinion that simply took off and has had a life of its own. 389 U.S. at 360-62, 88 S.Ct. at 516-17, 19 L.Ed.2d at 587-88 (Harlan, J., concurring). In Katz, the United States Supreme court overruled the Olmstead case, a highly formalistic opinion which held government eavesdropping did .not violate the Fourth Amendment because it involved no physical trespass. Olmstead, 277 U.S. at 466, 48 S.Ct. at 568, 72 L.Ed, at 951 (majority opinion); overruled by Katz, 389 U.S. at 353, 88 S.Ct. at 512, 19 L.Ed.2d at 583 (majority opinion). In his concurring opinion, Justice Harlan noted shortcomings in traditional trespass theory in search and seizure jurisprudence. Katz, 389 U.S. at 362, 88 S.Ct. at 517, 19 L.Ed.2d at 588 (Harlan, J., concurring). He stated that the Fourth Amendment also protected “reasonable expectations of privacy.” Id.
Justice Harlan plainly never intended his formulation to replace all previous search and seizure law. His phrase was designed to supplement existing law and extend search and seizure protections to include government eavesdropping. See generally Short, 851 N.W.2d at 504 (explaining that the reasonable expectation of privacy standard was not designed to dilute search and seizure protections). In United States v. White, Justice Harlan made it clear that all intrusions significantly jeopardizing Fourth Amendment liberties should require a warrant. 401 U.S. 745, 786-87, 91 S.Ct. 1122, 1143, 28 L.Ed.2d 453, 478 (1971) (Harlan, J., dissenting).
In a remarkable turn of events, Justice Harlan’s “reasonable expectations of privacy” somehow became the test of the scope of the Fourth Amendment. And, in one of the great ironies of Fourth Amendment jurisprudence, it was now used as a tool to reduce the reach of Fourth Amendment protections! The test became a legal boomerang in the hands of a later Supreme Court.
It may well be the time has come to abandon the reasonable-expeetations-of-privacy test. Although born with the best of intentions and with excellent pedigree, it has been on legal parole now for a number of years. The reasonable-expectations-of-privacy test runs the risk of converting search and seizure law into a mere notice requirement. Indeed, in California v. Carney, the United States Supreme Court declared, improbably, that pervasive public regulation of automobiles and their drivers through licensure, registration, equipment regulation, and rules of the road puts drivers “on notice” that the passenger compartment, which has nothing to do with registration, equipment or rules of the road, may be searched without a warrant. 471 U.S. 386, 391-92, 105 S.Ct. 2066, 2069-70, 85 L.Ed.2d 406, 413-14 (1985).
The time has probably come to revoke parole on the reasonable-expectations-of-privacy test. No warrant required. The better approach to privacy is that provided by the Oregon Supreme Court, which has declared that the issue is not the privacy one reasonably expects, but the privacy to which one has a right to enjoy. State v. Tanner, 304 Or. 312, 745 P.2d 757, 762 n. 7 (1987) (en banc); see Short, 851 N.W.2d at 504. Alternatively, the analysis could focus on the text: the right of citizens to be “secure” in their houses, papers, and effects. See Thomas K. Clancy, Fourth Amendment: Its History and Interpretar tion 47 (2008); Ochoa, 792 N.W.2d at 277. *133 Such an approach would be consistent with the original purpose of the reasonable-expectations-of-privacy test in Katz. See 389 U.S. at 362, 88 S.Ct. at 517, 19 L.Ed.2d at 588.
F. Exceptions to the Warrant Requirement. While the warrant requirement is central to search and seizure law, there have been well-recognized exceptions to it, including searches and seizures incident to arrest and arising from exigent circumstances when, for instance, crime is ongoing or, the health and safety of individuals are imminently threatened. We have repeatedly stated, however, that war-rantless searches are “virtually ‘per se unreasonable ... subject only to a few specifically established and well-delineated exceptions.’ ” State v. Baldon, 829 N.W.2d 785, 791 (Iowa 2013) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854, 858 (1973)). These exceptions, however, must be jealously guarded and “carefully drawn.” State v. Strong, 493 N.W.2d 834, 836 (Iowa 1992).
We have of course recognized exceptions to the warrant requirement, and I do not quarrel with the proposition that they exist. However, as in Camara v. Municipal Court, an exception to the warrant requirement generally requires that the government demonstrate it is simply inherently impracticable to obtain a warrant to accomplish the compelling governmental mission. 387 U.S. 523, 536-39, 87 S.Ct. 1727, 1735-36, 18 L.Ed.2d 930, 940-41 (1967). For instance, it would be impossible to obtain a warrant prior to a Terry-type pat down without arresting the suspect. Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889, 905 (1968). In Camara, it would have been impossible to obtain a warrant based upon probable cause at a specific location because, while there certainly was an infestation within the geographic area, there was no way to determine which specific residence was experiencing the problem. See 387 U.S. at 536-38, 87 S.Ct. at 1735, 18 L.Ed.2d at 939-41. A search incident to arrest must necessarily occur simultaneously with the arrest, not after the passage of time required to obtain a warrant.
In considering exceptions to the warrant requirement, there is a distinction between inherent impracticability and mere inconvenience. Obtaining a warrant is always inconvenient in the sense that it imposes some burdens on law enforcement. If mere inconvenience were enough to excuse the warrant requirement, there would be little left of it. Instead, inherent impracticability requires that, given the nature of the problem and the policy being advanced, one simply cannot get a warrant based on probable cause prior to the search.
The question of inherent impracticability of obtaining a warrant was considered in a study of probation in Wisconsin. The survey found that a warrant requirement would not unduly burden probation officers. Howard P. Schneiderman, Conflicting Perspectives from the Bench and the Field on Probationer Home Searches—Griffin v. Wisconsin Reconsidered, 1989 Wis. L. Rev. 607, 664 (1989). There is no reason to think a different result would occur in the context of parole.
G. Rejection of Act of Grace, Waiver, or Constructive Custody Theories for Parolees. Finally, it is important to note that we have rejected the theories that parolees are not entitled to search and seizure protections because they are in “constructive custody,” have “waived” their search and seizure rights, or are on parole only through “an act of grace.” See Ochoa, 792 N.W.2d at 290-91. In Ochoa, we rejected all these theories, noting that although the state may have the power to *134 imprison a parolee, the fact that the parolee is released into the community is the overriding factor for search and seizure analysis. See id.
II. Analysis of the Majority Opinion in Light of Search and Seizure Principles.
Unfortunately, the majority opinion does not apply many-of the above principles in a straightforward fashion. The constitutional value of a warrant — not simply the probable cause determination, but also the proportionality requirements and the requirement of justification before the fact— is not considered. The majority opinion on occasion, citing United States Supreme Court precedent, flirts with a version of “reasonableness” though ultimately rejects its most protean rendition in a footnote. Further, the majority does not seem to recognize the constitutional importance of the house-as-a-castle doctrine. And, it ironically uses the concept of reasonable expectations of privacy as a sword to cut at the core of search and seizure protection in the home.
While the majority uses “special needs” to support its result, it glides over the critical question, namely, whether it is inherently impracticable to obtain a warrant or just inconvenient. Further, it does not address the fact that parole officers have two functions, including a law enforcement function.
The majority seeks to limit the scope of the powers of parole officers in several ways. It requires “reasonable suspicion.” Reasonable suspicion is a tool of particularity that can help cabin government conduct. See Baldon, 829 N.W.2d at 823 (Appel, J., specially concurring); Ochoa, 792 N.W.2d at 273. Reasonable suspicion is said to exist when “articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer” to investigate further. Maryland v. Buie, 494 U.S. 325, 334, 110 S.Ct. 1093, 1098, 108 L.Ed.2d 276, 286 (1990). It is something more than a hunch, but something less than probable cause. See State v. Tague, 676 N.W.2d 197, 204 (Iowa 2004) (detailing reasonable suspicion standard); Craig S. Lerner, Reasonable Suspicion and Mere Hunches, 59 Yand. L. Rev. 407, 459-60 (2006) (same). An officer’s subjective belief that he or she has sufficient suspicion to justify the intrusion is insufficient to satisfy the reasonable suspicion standard. See Terry, 392 U.S. at 22, 88 S.Ct. at 1880, 20 L.Ed.2d at 905-06.
However, here, there was no more than a hunch, especially after the parole officers determined the ankle bracelet was functioning properly and King had a reasonable explanation for why he had been in his residence for the last two days. My view is consistent with a number of cases. For instance, in People v. Thornburg, probation officers recovered pornographic DVDs in a search of a probationer’s bedroom. 384 Ill.App.3d 625, 324 Ill.Dec. 13, 895 N.E.2d 13, 14-15 (2008). Although the home visit, pursuant to a probation agreement, was not cited as raising a constitutional problem, the search of the bedroom was invalid because it lacked reasonable suspicion. Id., 324 Ill.Dec. 13, 895 N.E.2d at 19. In United States v. Payne, the United States Court of Appeals for the Sixth Circuit held that the defendant’s two prior drug convictions and an anonymous tip did not amount to reasonable suspicion. 181 F.3d 781, 789-91 (6th Cir.1999). One court noted that a factor in determining whether a search was based on reasonable suspicion or a hunch was whether a parolee had a reasonable explanation for his whereabouts, which was certainly present in this case. See Commonwealth v. Edwards, 874 A.2d 1192, 1196 (Pa.Super.Ct.2005).
*135 III. Alternative Constitutional Visions.
A. Approach in Cullison. In my view, it would have been far easier, far simpler, and far more consistent with search and seizure constitutional norms, to simply follow the rule in State v. Cullison, 173 N.W.2d 533 (Iowa 1970). In Cullison, we rejected stripping or diluting the rights of parolees based on “what may best be described as a soeio-juristic rationalization, i.e., protection of the public and constructive custody.” Id. at 536. Such an approach was not “constitutionally sound, reasonable, fair or necessary.” Id. We further stated that the “‘dilution’ theory begins and ends nowhere, being at best illusory and evasive.” Id. Plainly, in Culli-son, we rejected a categorical balancing test based on “reasonableness.” See id.
The majority opinion in this case flies directly against the Cullison precedent. It does precisely what Cullison cautioned against, namely it dilutes the search and seizure protections of parolees based upon “soeio-juristic rationalization.” See id. It is error to do so.
B. The Home Visit: Differentiating Between Parole Officers’ Functions of Rehabilitation and Law Enforcement. The majority opinion evinces a pragmatic concern for the benevolent role of parole officers. No doubt, parole officers, like the government officers in Knights performing a search of a probationer’s residence, perform a dual function of rehabilitating parolees while also ensuring that the law is enforced. See 534 U.S. at 120-21, 122 S.Ct. at 592, 151 L.Ed.2d at 506. Ordinarily, it is difficult to separate dual purposes, and Cullison stands for the proposition that we should not try to do so.
But there is an alternative constitutional vision. Under that vision, a home visit is not a search. The purpose of the home visit is to meet with the parolee and determine the status of the parolee in his or her rehabilitation effort. When a parole officer begins to look into places in the residence outside common areas, such as bedrooms, however, the law enforcement function objectively predominates and a warrant is required.
There is support for this theory in case-law. A number of cases hold that a home visit by a parole officer is not a search. See, e.g., United States v. LeBlanc, 490 F.3d 361, 367 (5th Cir.2007); Fitzharris, 521 F.2d at 250; State v. Moody, 334 Mont. 517, 148 P.3d 662, 666-67 (2006). A home visit in areas in which visitors are commonly entertained is likely to be conducted for benevolent purposes of parole, namely, assisting the parolee in completing parole and reintegrating into the community. A visit in private areas of the residence, however, is more likely to be a law enforcement function. Thus, under this line of cases, the authority to conduct a home visit in areas in a residence in which visitors are customarily allowed does not carry with it the authority to conduct a search of private areas of the residence. See State v. Guzman, 164 Or.App. 90, 990 P.2d 370, 373-74 (1999) (“[T]he authority to conduct a home visit under the conditions of probation does not encompass the authority to conduct a search.”). The home visit, however, cannot be used as a subterfuge to avoid the probable cause burden that must be met to support an investigative search. “Once the purpose behind the search shifts from a home visit to a quest for evidence to be used in a criminal prosecution, the [government] may only enter the premises upon securing a warrant supported by full probable cause.” Commonwealth v. Young, No. CRIM. A. 98-11253, 1999 WL 218423, at *3 (Mass.Super.Ct. Mar. 30, 1999).
C. Lack of Reasonable Suspicion. A third constitutional vision simply requires *136 that the concept of reasonable suspicion have some teeth. In this case, the facts supporting reasonable suspicion, particularly after the ankle bracelet issue was resolved, were rather thin. The difference between reasonable suspicion and a hunch is difficult to describe, perhaps, but in this case, the evidence falls short of what is required to support a warrantless search. This is particularly so given our general admonition, expressed years ago, that we give the search and seizure provisions of article I, section 8 “a broad and liberal interpretation for the purpose of preserving ... liberty.” State v. Height, 117 Iowa 650, 661, 91 N.W. 935, 938 (1902).
IV. Narrow Interpretation of This Case.
Finally, I note that the majority opinion is extremely limited. It does not apply to the activities of law enforcement. It does not endorse freestanding reasonableness, a hungry beast that could threaten the warrant requirement. It is limited to a search for drugs when the underlying crime for which the parolee was convicted is a drug offense and when the particularity requirement of reasonable suspicion has been determined to be present. It reserves the question of whether a parolee has a right to refuse the search. Most importantly, this case should not be seen as a wholesale adoption of so-called “special needs” as developed by the ever-expanding cases of the United States Supreme Court.
For the reasons stated above, I dissent.
WIGGINS and HECHT, JJ., join this dissent.